**AIRCRAFT OWNERS AND PILOTS
ASSOCIATION, Petitioner,**

v.

**FEDERAL AVIATION
ADMINISTRATION,
Respondent,**

WSET, Inc., Intervenor.

No. 77–1904.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1979.

Decided May 17, 1979.

Rehearing Denied June 5, 1979.

Charles J. Peters, Washington, D. C., with whom John S. Yodice, Washington, D. C., was on the brief, for petitioner.

Mark H. Gallant, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

Thomas J. Keller, Washington, D. C., was on the brief for intervenor.

Before BAZELON, TAMM and WIL-KEY, Circuit Judges.

TAMM, Circuit Judge:

Petitioner, Aircraft Owners and Pilots Association (AOPA), seeks direct review[1] of a determination of the Federal Aviation Administration (FAA) that the proposed construction of a television antenna tower on a site near Thaxton, Virginia, would not constitute a hazard to air navigation. We find the informal adjudicatory procedures employed by the FAA created a record which contains substantial evidence supporting the no-hazard decision. Accordingly, we affirm.

## I

The Federal Aviation Act of 1958 (Act), 49 U.S.C. §§ 1301–1542 (1976), authorizes the FAA to promote air safety, 49 U.S.C. §§ 1303(a), 1655(c)(1) (1976), and to regulate the use of navigable air space, 49 U.S.C. §§ 1348(a), 1655(c)(1) (1976). Section 1101 of the Act specifically recognizes the threat that tall structures may pose to air safety and provides that the FAA

shall, by rules and regulations, or by order where necessary, require all persons to give adequate public notice, in the form and manner prescribed by the [Administrator], of the construction or alteration, or of the proposed construction or alteration, of any structure where notice will promote safety in air commerce.

49 U.S.C. §§ 1501, 1655(c)(1) (1976).

Pursuant to these statutory powers, the FAA promulgated Part 77 of the Federal Aviation Regulations, 14 C.F.R. § 77 (1978). The pertinent provisions of these regulations require each person who proposes construction or alteration of structures of particular dimensions and within specific proximity to airports to notify the FAA. 14 C.F.R. §§ 77.11, .13, .15. The FAA uses this information to make "[d]eterminations of the possible hazardous effect of the proposed construction or alteration on air navigation." 14 C.F.R. § 77.11(b)(2). The regulations set out various standards against which proposals may be evaluated, see 14 C.F.R. § 77.23(a), and also require the FAA to conduct aeronautical studies in certain circumstances, see 14 C.F.R. §§ 77.-19(c)(3), .35(a).

The initial hazard/no-hazard decision is made by a staff member in the FAA's Air Traffic Division. That decision is final unless the Administrator of the FAA (Administrator) grants discretionary review. 14 C.F.R. § 77.37. The Administrator's review may be based on written materials or on a public hearing held in accordance with procedures prescribed in 14 C.F.R. §§ 77.-41–.69, .37(c)(1)–(2).

Once issued, a hazard/no-hazard determination has no enforceable legal effect.[2]

---

1. Aircraft Owners and Pilots Association (AOPA) initially filed this action in the United States District Court for the District of Columbia. The court (Flannery, J.) dismissed AOPA's complaint, properly ruling that jurisdiction to review hazard/no-hazard determinations issued by the Federal Aviation Administration (FAA) lies exclusively in the courts of appeal under 49 U.S.C. § 1486(a) (1976). *See*

*Aircraft Owners & Pilots Ass'n v. FAA*, Civ. No. 77–1643 (D.D.C. Sept. 21, 1977).

2. A no-hazard determination, although technically advisory in nature, is a "final disposition," judicially reviewable as an order under section 1006(a) of the Federal Aviation Act of 1958, 49 U.S.C. § 1486(a) (1976). *City of Rochester v. Bond*, —— U.S.App.D.C. ——, 603 F.2d 927, No. 78–1352 (March 29, 1979); *Air Line Pilots'*

The FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation. Nevertheless, the ruling has substantial practical impact. The Federal Communications Commission, for example, considers the FAA's classification in granting permits for the construction of broadcast towers.[3] 47 C.F.R. § 17.4 (1978). The ruling may also affect the ability of a sponsor proposing construction to acquire insurance or to secure financing. Primarily, however, the determination promotes air safety through "moral suasion" by encouraging the voluntary cooperation of sponsors of potentially hazardous structures. *Air Line Pilots' Association International v. FAA*, 446 F.2d 236, 240 (5th Cir. 1971).

## II

This case arises out of the proposed construction of a television antenna tower by WSET, Inc. (WSET)[4] near Thaxton, Virginia.[5] The initial height of the tower, 1,506 feet above ground level,[6] exceeded the 200 foot notice standard set out in Subpart B of the FAA's regulations, 14 C.F.R. § 77.13(a)(1). Accordingly, on April 28, 1976, WSET notified the FAA of its plan to construct the tower. On May 12, 1976, the FAA acknowledged receipt of the notice, stated that it would conduct an aeronautical study to determine the effect of the proposed tower upon air safety, and invited the comments of interested persons.

AOPA,[7] among others,[8] lodged written objections to the tower construction with the FAA. The objecting parties primarily contended that the tower would interfere with Visual Flight Rule (VFR) flyways[9] and would require an increase in minimum altitudes for radar vectoring[10] in the area.[11] *See* Joint Appendix (J.A.) at 4–14, 31.

On July 30, 1976, the FAA held an informal meeting to solicit further comments of interested persons. *See* 14 C.F.R. § 77.35(b)(4). Opponents of the tower repeated their concern that it would interfere with

---

*Ass'n, Int'l v. FAA*, 446 F.2d 236, 240–41 (5th Cir. 1971). *See generally Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 140–41, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *Reminga v. United States*, 448 F.Supp. 445, 463 (W.D.Mich. 1978).

3. *See, e. g., Chronicle Publishing Co. v. FCC*, 125 U.S.App.D.C. 53, 366 F.2d 632 (1966) (per curiam); *Application of WLCY–TV, Inc.*, 38 F.C.C.2d 86, 90–91 (1972).

4. WSET, Inc. (WSET), an intervenor in this appeal, is the successor in interest of WLVA, Inc. WSET operates WSET–TV, broadcasting on channel 13, Lynchburg, Virginia.

5. The proposed tower would be situated in a rural valley about midway between Roanoke, Virginia, and Lynchburg, Virginia. The precise location is 15.5 nautical miles (NM) east of the Roanoke Airport, 20 NM west of the Lynchburg Airport, and 14 NM northwest of the New London Airport.

The tower would underlie Federal Airway Victor 16–260. Joint Appendix (J.A.) at 31. A "victor airway" is an established line (or radial) along which pilots proceed with the aid of very high frequency omnidirectional range (VOR) navigational equipment. Ground VOR equipment emits signals which allow a pilot to ascertain his whereabouts and chart his own course along a radial directly between two points.

6. *See* text at —— of 195 U.S.App.D.C., 968 of 600 F.2d *infra*.

7. AOPA is a nonprofit corporation comprised of general aviation aircraft owners and pilots, intended to promote, protect, and serve the interests of the members as owners and pilots of general aviation aircraft.

8. Other objecting parties were the Virginia State Corporation Commission Division of Aeronautics, the Chief Controller of the Roanoke Airport Tower, the Air Transport Association of America, and the Air Line Pilots Association. The Eastern Regional Office of the FAA also contested the proposed tower.

9. *See* 14 C.F.R. §§ 91.105–.109, .33(b)–(c) (1978).

10. Radar vectoring occurs when an air traffic controller charts a pilot's course by issuing directional headings through use of radar. Vectoring requires the pilot to operate at altitudes sufficient to allow obstruction free use of radar.

11. Other objections were that the tower would disrupt existing IFR procedures and that it would interfere with slow climbing eastbound aircraft departing the Roanoke Airport and slow climbing westbound aircraft departing the Lynchburg Airport.

VFR operations, especially during marginal weather conditions. They also asserted that the tower would impair Instrument Flight Rule (IFR) operations [12] and Air Traffic Control procedures.

The FAA began its investigation by surveying the number of VFR flights traveling between Lynchburg, Virginia, and Roanoke, Virginia, within close proximity to the tower. During the one-month period of June 23 to July 26, 1976, the survey showed twenty flight plans were filed in which aircraft passed within two miles of the site at an altitude of 3,500 feet or below. J.A. at 16.

On November 2, 1976, the FAA conducted a comprehensive on-site flight inspection and evaluation of the tower proposal, including simulation of all phases of VFR operations. The study focused particularly on IFR and VFR interference and concluded that the tower would have "no substantial adverse effect on aeronautical operations" provided it was equipped with high intensity white obstruction lights. Id. at 33. The FAA, relying on this study, gave the tower a no-hazard rating on November 22, 1976. Id. at 30–35.

Within a month of the initial decision, AOPA petitioned the FAA for review. See 14 C.F.R. § 77.37. The petition reasserted previously raised objections with regard to VFR and IFR operations. AOPA further claimed that the FAA's decision violated specific hazard guidelines set out in FAA Handbook 7400.2B (Handbook).

The FAA Director of Air Traffic Service [13] granted discretionary review by notice on January 10, 1977. The notice stated that the review would be conducted "without public hearing" on "the basis of written materials" in accordance with 14 C.F.R. § 77.37(c)(1). J.A. at 53–54. The notice also stated that the review would "consider all material relevant to the question of whether the proposed construction would have a substantial adverse effect on the safe and efficient use of airspace." Id. at 54. To this end, the FAA invited interested persons to comment.

On January 25, 1977, ATC Associates, Inc. (ATC), aviation consultants for WSET, submitted remarks with respect to AOPA's petition for review. On February 15, 1977, AOPA responded to ATC's report, suggesting that the FAA establish an antenna farm [14] southwest of Roanoke and relocate the tower in that area.[15] By letter dated March 2, 1977, the FAA stated that the proposal was incorporated into the record and would be considered "in the discretionary review." [16] Id. at 83.

On March 14, 1977, the FAA conducted another in-flight evaluation of the site. It again surveyed the VFR flights operating between Lynchburg and Roanoke at altitudes below 4,500 feet. According to the survey, only four such flight plans were filed between March 1 and 13, 1977. Id. at 84, 116.

After the protesting parties renewed their objections, the FAA engaged in infor-

12. See 14 C.F.R. §§ 91.115–.129, .33(d).

13. The FAA Administrator delegated review authority, under 14 C.F.R. § 77 (1978), to the Director of the Air Traffic Service. See 30 Fed.Reg. 13023 (Oct. 13, 1965).

14. "An antenna farm area consists of a specified geographical location with established dimensions of area and height, where antenna towers with a common impact on aviation may be grouped," 14 C.F.R. § 77.73(a), in order "to localize their effect on the use of navigable air space," 14 C.F.R. § 77.71(a).

15. AOPA's suggestion was prompted by WSET's proffered justification for the tower construction. WSET had contended that the inadequacy of its technical coverage precluded

effective competition with other affiliates in the area. According to AOPA, the antenna farm would satisfy WSET's competitive needs because the towers of the two major competitors, WDBJ and WFLS, are presently located in that vicinity. AOPA did not discuss the technical feasibility of its proposal, nor did it contend that the necessary property was available.

16. AOPA in its brief challenges the FAA's processing of its antenna farm proposal. Brief for Petitioner at 19–21. It contends primarily that the FAA should have considered the proposal in a separate rulemaking proceeding. This contention was not raised before the FAA, and we are precluded from considering it. 49 U.S.C. § 1486(e) (1976).

mal negotiations with ATC concerning possible relocation of the tower.[17] ATC agreed to reexamine the proposal and asked the FAA to hold review in abeyance pending further exploration of WSET's alternatives. On May 17, 1977, ATC advised the FAA that WSET was willing to lower the tower height at the Thaxton site by 300 feet. *Id.* at 91. The FAA informed WSET and other participants in the proceeding that review would continue based on a reduced height of 1,206 feet above ground level. The FAA allowed ten days for comment. *Id.* at 92. AOPA and others [18] indicated that the 300 foot decrease did not alter their prior objections.

On July 12, 1977, the Director of Air Traffic Service [19] affirmed the no-hazard determination. The Director thoroughly reviewed the evidence, evaluated the objections, and concluded that the tower constituted no hazard to air safety at the reduced height, provided it was equipped with high intensity obstruction lights. *Id.* at 107–18. The FAA forwarded a copy of this affirmation and accompanying opinion to the FCC.[20]

AOPA filed a petition for reconsideration on July 29, 1977. The FAA denied the request. This appeal ensued.

### III

At the outset, both parties squarely call upon us to define the parameters of our review. Section 1006(e) of the Act provides that "findings of fact by the [Civil Aeronautics] Board or the [Administrator of the FAA], if supported by substantial evidence, shall be conclusive." 49 U.S.C. § 1486(e) (1976). The question presented is how should a court apply the substantial evidence standard of review to an informal adjudication during which the agency decisionmaker receives information through nonadversary proceedings and written submissions, rather than formal, trial-type hearings. The FAA contends that the purpose of substantial evidence review cannot be served by application to informal adjudication not held on a formal record. The FAA urges, instead, application of the arguably less rigorous arbitrary and capricious standard.[21] AOPA counters by insisting that we adhere to the plain language of the statutory standard of review.

■ The FAA premises its argument on an analogy to the review provisions set out in the Administrative Procedure Act (APA). Substantial evidence review under the APA is properly invoked only in cases subject to the formal hearing procedures of sections 556 and 557 of the APA, 5 U.S.C. §§ 556, 557 (1976), or otherwise reviewed after a formal agency hearing required by statute. 5 U.S.C. § 706(2)(E) (1976).[22] The no-hazard determination in this case, as discussed previously, occurred after interested parties had the opportunity to comment upon the

---

**17.** AOPA objects to these meetings as impermissible ex parte contacts. This argument is without merit. First, AOPA had complete record opportunity to respond to the resulting proposals. *See* text at ———— of 195 U.S. App.D.C., pp. 968–969 of 600 F.2d *infra.* Second, the regulations governing hazard/no-hazard determinations do not prohibit ex parte contacts. The ability to informally negotiate, in fact, comports with the regulatory purpose of "moral suasion." Further, we note that AOPA itself engaged in similar ex parte conduct by meeting informally with FAA officials on December 8, 1976. J.A. at 36–40.

**18.** *See* note 8 *supra.*

**19.** *See* note 13 *supra.*

**20.** On January 19, 1977, WSET had filed an application with the Federal Communications Commission for a construction permit. *See* 47 C.F.R. § 17.4 (1978).

**21.** Both parties assume that review under the substantial evidence standard is stricter than that conducted pursuant to the arbitrary and capricious test. *See generally Abbott Laboratories v. Gardner,* 387 U.S. 136, 143, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Wright, *The Courts and the Rulemaking Process: The Limits of Judicial Review,* 59 Cornell L.Rev. 375, 391–92 (1974).

**22.** *See, e.g., Camp v. Pitts,* 411 U.S. 138, 140–41, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam); *United States v. Allegheny-Ludlum Steel Co.,* 406 U.S. 742, 756–57, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414–15, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

proposed construction and to meet informally with FAA officials. *See* text at —— —— —— of 195 U.S.App.D.C., 967–968 of 600 F.2d *supra.* Unlike formal adjudication under sections 556 and 557, however, the process did not involve trial-type, adversarial hearings, nor was the FAA's decision confined to a formal record. In fact, the regulations governing procedures for hazard/no-hazard determinations specifically exclude application of sections 556 and 557.[23]

■ The FAA proceeds by analyzing the relationship that exists between the formal record compiled in the course of trial-type proceedings and application of the substantial evidence standard. According to the FAA, the substantial evidence requirement insures the integrity of a decision required to be made on the record of a mandatory hearing by precluding consideration of extra-record evidence which the parties had no opportunity to refute. A reviewing court determining whether the factual findings of the agency are based on substantial evidence weighs the evidence in the record supporting the decision against that which is contradictory. As long as sufficient evidence exists that "a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), the agency's findings must be upheld. *Universal Camera Co. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1957). The FAA contends that if a hearing

is merely a discretionary adjunct to an agency's internal factfinding process, as it is here, and if the decision need not be confined to the parameters of a public record, the restrictive purpose of the substantial evidence constraint no longer obtains. *See City of Chicago v. FPC,* 147 U.S.App. D.C. 312, 325, 458 F.2d 731, 744 (1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972).[24] *See generally* Scalia & Goodman, *Procedural Aspects of the Consumer Product Safety Act,* 20 U.C.L.A.L. Rev. 899, 933–36 (1973).

We recognize that application of the substantial evidence standard may be troublesome, as well as purposeless, when applied to an informal adjudicatory decision made absent the creation of an adequate record. *Tiger International, Inc. v. CAB,* 554 F.2d 926 (9th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 532, 54 L.Ed.2d 467 (1977), relied upon by the FAA, illustrates the inherent problems. In *Tiger,* the Ninth Circuit held that a Civil Aeronautics Board (CAB) decision rendered without a hearing was properly reviewed under the arbitrary and capricious standard despite the plain language of section 1006(e) of the Act. *Id.* Particularly compelling to the court was the fact that, because of the permissible use of informal procedures, only the petitioners submitted evidence. The court refused to require the CAB to reach a result supported by substantial evidence on a record compiled essentially by only one side of the controversy. *Id.* at 936 & n. 19.[25] Similarly, in

23. Although the FAA may, in its discretion, convene an air-space "meeting" prior to rendering a hazard/no-hazard determination, 14 C.F.R. § 77.35(b)(4), or hold a hearing upon review of the decision, 14 C.F.R. § 77.37(c)(2), these proceedings are informal and nonadversary. 14 C.F.R. § 77.43. Section 77.43 specifically states that the formalities set out in the Administrative Procedure Act, 5 U.S.C. §§ 553, 554, 556, and 557 (1976), are inapplicable in hazard/no-hazard determinations.

24. In *City of Chicago v. FPC,* 147 U.S.App.D.C. 312, 325, 458 F.2d 731, 744 (1971), *cert. denied,* 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972), the court explained that absent formal proceedings, "the record . . . will contain more generalized than specific information . . . . . For this reason, application of the

substantial evidence test . . . would be of scant utility."

25. The *Tiger* court could have applied the substantial evidence standard by remanding to the Civil Aeronautics Board with instructions to adopt additional procedural requirements insuring that all sides to a controversy were represented in every proceeding. This solution would have indirectly vitiated the wide-ranging procedural discretion granted by Congress to the CAB. *Tiger Int'l, Inc. v. CAB,* 554 F.2d 926, 936 & n. 18 (9th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 532, 54 L.Ed.2d 467 (1977). Additionally, requiring procedural safeguards not statutorily mandated violates the Supreme Court's prohibition in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense*

*Association of Bank Travel Bureaus, Inc. v. Board of Governors of Federal Reserve System,* 568 F.2d 549, 552 & n. 5 (7th Cir. 1978), the Seventh Circuit, although acknowledging the "substantial evidence" language of the pertinent judicial review statute, declined to review the results of informal rulemaking by the Federal Reserve Board under the substantial evidence standard.[26]

AOPA opposes the FAA by contending that the explicit statutory language of section 1006(e) mandates application of the substantial evidence standard and that the standard, as traditionally formulated, can be applied to the record now before us. AOPA specifically relies upon *Pillai v. CAB,* 158 U.S.App.D.C. 239, 485 F.2d 1018 (1973), in which this court reviewed under the substantial evidence standard CAB orders issued without a formal hearing. The court held the statutory standard applicable, notwithstanding the sparse record before the CAB:[27] "To the extent that the [CAB's] 'public interest' determination involved factual predicates, the substantive statute requires that they be supported by substantial evidence." *Id.* 158 U.S.App.D.C. at 244, 485 F.2d at 1023 (footnote omitted). *Accord, Air Line Pilots' Association International v. FAA,* 446 F.2d at 241; *Railway Express Agency, Inc. v. CAB,* 120 U.S.App.D.C. 228, 231–32, 345 F.2d 445, 448–49 & n. 9 (1965).

*See also Public Systems v. Federal Energy Regulatory Commission,* No. 76–1609, slip op. at 11–14 & nn. 32–34 (D.C.Cir. Feb. 16, 1979).

AOPA argues that the present action not only falls squarely within the requirement of *Pillai,* but in fact presents a stronger case. The record before the FAA in this action was not sparse. Although the FAA was not confined to the public record, that record embraced all facts necessary to make a hazard/no-hazard determination; and there is no indication that the FAA relied upon any extra-record evidence. We thus do not encounter the practical difficulty, illustrated by *Tiger,* of applying the substantial evidence test to agency action based on internal agency knowledge. AOPA concludes that because application of the substantial evidence test is feasible in this case, we may not deviate from the plain wording of section 1006(e).

■ We agree that as long as the substantial evidence standard can be applied, section 1006(e) mandates that it must be applied. In so holding, we need not rule on the appropriate standard for reviewing a decision made on the basis of informal procedures which result in the creation of a record containing arguments and evidence of just one party.[28] In the case before us,

*Council,* 435 U.S. 519, 546–48, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

**26.** The judicial review statute applicable in *Association of Bank Travel Bureaus, Inc. v. Board of Governors of Fed. Reserve Sys.,* 568 F.2d 549 (7th Cir. 1978), provides that "findings of the Board as to facts, if supported by substantial evidence, shall be conclusive." 12 U.S.C. § 1848 (1976). *See also National Courier Ass'n v. Board of Governors of Fed. Reserve Sys.,* 170 U.S.App.D.C. 301, 307, 516 F.2d 1229, 1235 nn. 7 & 8 (1975) (rejecting application of the substantial evidence standard to a decision of the Federal Reserve Board without reference to the operative language of 12 U.S.C. § 1848).

**27.** The record in *Pillai* consisted only of the proposed orders, written justifications submitted by three American air carriers, written comments by an association of supplemental carriers, minutes of a currency conference, and the complaint of a consumer group. *Pillai v. CAB,* 158 U.S.App.D.C. 239, 243, 485 F.2d 1018, 1023 (1973).

**28.** We note, however, that this court recently has ascribed to the view that the functional distinction between the substantial evidence and the arbitrary and capricious standards may be largely semantic in the limited class of cases involving challenges to the validity of factual findings made through informal proceedings. *See Public Sys. v. Federal Energy Regulatory Comm.,* No. 76–1609, slip op. at 13–14 n. 34 (D.C.Cir. Feb. 16, 1979); *Pacific Legal Foundation v. Department of Transp.,* 193 U.S.App. D.C. 184 at 189 n. 35, 593 F.2d 1338 at 1343 (1979); *American Public Gas Ass'n v. FPC,* 186 U.S.App.D.C. 23, 35–6, 567 F.2d 1016, 1028–29 (1977), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978). *See also Paccar, Inc. v. National Highway Traffic Safety Administration,* 573 F.2d 632, 636 (9th Cir.), *cert. denied,* 99 S.Ct. 94 (1978); *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688, 705 (2d Cir.) (Lumbard, J., concurring), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975); *Associated Indus. of New York State, Inc. v. Department of Labor,* 487 F.2d 342, 349–50 (2d

we can and do meaningfully apply the substantial evidence standard to the record consisting of arguments and evidence submitted by opposing sides.

### IV

■■■ AOPA asks us to set aside the FAA's no-hazard determination as unsupported by any probative evidence. AOPA further charges that the decision violates provisions of the Handbook [29] that prescribe criteria for hazard/no-hazard evaluations. Neither objection is meritorious.

Contrary to AOPA's first contention, the evidence contained in the comprehensive aeronautical study conducted by the FAA sufficiently supports its no-hazard determination. This study analyzed separately the IFR and VFR effects of the proposed tower. With respect to IFR operations, the study disclosed that the tower would not: (a) require change to the Minimum Enroute Altitude of Federal Airway Victor 16–260,[30] nor interfere with aeronautical operations on this airway; (b) require change in Roanoke Airport's standard instrument approach procedures; (c) interfere with departure procedures or require the establishment of take-off minimums; (d) substantially adversely affect local radar vectoring operations, although an increase in the vectoring altitude from 3,800 to 4,400 feet in proximity to the tower would be required. J.A. at 32.

AOPA does not challenge the validity of these findings. Rather, AOPA argues that the study is defective for failure to address the tower's effect on IFR departures from Lynchburg Airport. The FAA explained that because the minimum altitude of these flights is 5,000 feet—2,000 feet above the reduced level of the tower—they would not be affected by the proposed construction. *Id.* at 115. AOPA disputes this logic, contending that the tower jeopardizes the safety of pilots who encounter engine trouble and lose altitude while flying over the tower. We find the reasonableness of the FAA's conclusion undisturbed by this generalized complaint which, on its face, could be levied against construction of any tall structure. AOPA has not come forth with any evidence showing that the WSET tower poses a particular threat to pilots flying under IFR rules.

With respect to VFR operations, the study demonstrated that the tower would not interfere with traffic pattern operations at any airport. The study analyzed the effects on VFR enroute operations and found that the tower would not: (1) impede flights visually guided by the highway, U.S. Route 460; (2) necessitate substantial change in operations using Federal Airway Victor 16–260; (3) have any impact on north or south bound VFR operations because the northern mountainous terrain causes approaching flights to proceed at higher altitudes. *Id.* at 32–33.

AOPA's attack on the validity of the FAA's conclusion that the tower presents no hazard to VFR flights centers on application of the Handbook criteria. The Handbook presents a series of "informal" guidelines [31] governing "procedures for handling airspace matters." Appendix to Brief for Petitioner at 16. Section 1441 of the Handbook defines adverse effect on air navigation, as relevant to this case, as follows:

> A proposed structure would have . . . an adverse effect if—
>
> a. . . . An IFR operation procedure or minimum flight altitude would

---

Cir. 1973) (Friendly, J.), *cert. denied,* 416 U.S. 942, 94 S.Ct. 1948, 40 L.Ed.2d 294 (1974).

**29.** The applicable sections of FAA Handbook 7400.2B (Handbook) are set out in the appendix to AOPA's brief. Appendix to Brief for Petitioner at 16–19.

**30.** *See* note 5 *supra.*

**31.** The FAA, apparently, has not enacted these guidelines into regulations. Section 1 of the Handbook explains, however, that except when "special procedures are set forth in Orders," Handbook procedures and criteria "*shall* be followed in handling airspace matters." Appendix to Brief for Petitioner at 16 (emphasis added). Section 5(a) of the Handbook defines "shall" as "mandatory." *Id.*

require a change if the proposed structure is erected . . . .

b. . . . A VFR operation would be required to change from regular flight course or altitude if the proposed structure is erected.

*Id.* at 17. Section 1442 states that if a structure has an adverse effect, that effect will be deemed "substantial" if "a significant volume . . . of aeronautical operations . . . would be affected." *Id.* Section 1445 of the Handbook provides that "significant volume" means that "one or more aeronautical operations per day [are] affected." *Id.* Finally, section 1444(b) of the Handbook states that a no-hazard determination is normally required when the evidence demonstrates that the proposed construction will have "no substantial adverse effect" on air navigation. *Id.*

The FAA contends that the proposed tower does not have a substantial adverse effect on flight operations within the meaning of sections 1442 and 1445 because, according to its survey of filed VFR flight plans, a significant volume of VFR flights would not be affected. A survey of flight plans covering a two-week period in March 1977 indicated that only four VFR flights, operating at 4,500 feet or below, passed within two miles of the tower. *See* text at ———— of 195 U.S.App.D.C., 968 of 600 F.2d *supra.* An earlier canvas conducted between June 23 and July 22, 1976 showed twenty flights, operating at or below 3,500 feet, passed over the tower. *See* text at ———— of 195 U.S.App.D.C., 968 of 600 F.2d *supra.* The FAA's conclusion, based on the results of these surveys, is consistent with the Handbook stipulations.

AOPA argues, however, that the survey results are illusory. It contends that the Lynchburg route is a popular VFR and IFR flyway and that the FAA figures represent no more than ten or fifteen percent of actual operations. AOPA offers no support for this proposition save its own bald assertion. It presents neither countervailing statistics, nor corroborative documentation. We cannot replace the expert judgment of the FAA, which appears solidly based on evidence in the record, with the speculative assumptions of AOPA.[32]

Further, even were we to assume that the flights comprised a substantial volume of traffic within the meaning of sections 1442 and 1445, we need not necessarily find the FAA's no-hazard determination inconsistent with the Handbook. Section 1452(f) of the Handbook specifically provides that:

Not every object penetrating into the navigable airspace is a hazard to air navigation if it can be marked and lighted in a manner so as to provide visual observance by pilots or is so located with respect to other permanent tall structures or natural terrain features so as not to increase the potential hazard to aircraft it may not adversely affect aeronautical operations . . . .

Appendix to Brief for Petitioner at 18. The no-hazard determination in this case was expressly conditioned on WSET's agreement to equip the tower with high intensity strobe lights, thereby "provid[ing] visual observance by pilots." *Id.* We note also that the surrounding mountainous terrain would mitigate what might otherwise have been a potential hazard to aircraft flying in northernly or southernly directions.

## V

Our review indicates that the no-hazard determination is reasonable and well supported in the record before us. Accordingly, we uphold the FAA's decision. In so doing, we are mindful of the FAA's expertise in these matters. As we explained in *Pillai v. CAB,* 158 U.S.App.D.C. at 248, 485 F.2d at 1027, " 'administrative prediction' and strategy in the face of essentially un-

---

32. We recognize that although the FAA's Airman's Information Manual urges that, as a minimum precaution, "[e]very pilot . . . file a flight plan before taking off," the regulations do not *require* pilots to file VFR flight plans. *See* Brief for Respondent at 12 n. 12. *Compare* 49 C.F.R. § 91.115(a) (IFR flight plan must be filed). The FAA's survey may not be completely precise for this reason. AOPA, however, has failed to produce any evidence of inaccuracy and, accordingly, cannot prevail on its unsupported contention.

provable levels of risk . . . constitute . . . the sort of determination for which this court should have the utmost deference . . . ."

*Affirmed.*