10-4612-ag
Paskar v. USDOT

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2011

(Argued: January 6, 2012          Decided: April 9, 2013          Corrected April 10, 2013)

Docket No. 10-4612-ag

———————————

KENNETH D. PASKAR AND FRIENDS OF LAGUARDIA AIRPORT, INC.,

*Petitioners*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION; RAY LAHOOD, SECRETARY OF
TRANSPORTATION; FEDERAL AVIATION ADMINISTRATION; AND J. RANDOLPH BABBIT,
ADMINISTRATOR, FEDERAL AVIATION ADMINISTRATION,

*Respondents*,

CITY OF NEW YORK,

*Intervenor Respondent*.

———————————

Before:

HALL and CHIN, *Circuit Judges*, and HELLERSTEIN, *Senior District Judge*.[*]

———————————

Petitioners Kenneth Paskar and Friends of LaGuardia Airport, Inc., seek review of

a September 2, 2010, letter written by the Federal Aviation Administration pursuant to 49 U.S.C.

---

[*] The Honorable Alvin K. Hellerstein, Senior District Judge for the U.S. District Court
for the Southern District of New York, sitting by designation.

- 1 -

§ 46110. The letter endorsed a series of recommendations made by a panel of experts regarding the impact of a proposed marine trash-transfer facility on safe airport operations at LaGuardia Airport. We hold that the letter does not constitute a final order reviewable by this Court. We DISMISS the petition for lack of jurisdiction.

—————————————

RANDY M. MASTRO, J. Ross Wallin, Gibson, Dunn & Crutcher LLP, New York, New York; Steven M. Taber, Taber Law Group, Irvine, California, *for Petitioners*.

ROBERT S. RIVKIN, General Counsel, Paul M. Geier, Assistant General Counsel, Joy Park, Trial Attorney, Department of Transportation; Daphne Fuller, Assistant Chief Counsel, Elizabeth Newman, Attorney Advisor, Federal Aviation Administration; Tony West, Assistant Attorney General, Michael Jay Singer, Abby C. Wright, Department of Justice, Washington, D.C., *for Respondents*.

MICHAEL A. CARDOZO (Leonard Koerner, Christopher Gene King, Elizabeth S. Natrella, Amy McCamphill, *on the brief*), Corporation Counsel of the City of New York, New York, New York, *for Intervenor Respondent*.

—————————————

Hellerstein, *Senior District Judge*:

Petitioners seek review of a letter written by the Federal Aviation Administration ("FAA") to the City of New York ("City") on September 2, 2010 (the "Letter"). Petitioners contend the Letter is a "final order" subject to review by this Court. The Letter states that the FAA agrees with an expert panel's finding that the City's plan to reopen a coastal garbage transfer facility in College Point, Queens, would be compatible with safe air operations as long as several recommendations are followed. The facility, the North Shore Marine Transfer Station ("Station"), is 2,206 feet across Flushing Bay from the landing threshold of Runway 31 at

LaGuardia Airport and 585 feet perpendicular to its extended centerline. We hold that, because the Letter is not a "final order" for purposes of 49 U.S.C. § 46110(a), we are without jurisdiction to review it. The petition for review is therefore dismissed.

## I.   Factual Background

LaGuardia Airport is located on the western shore of Flushing Bay, on the side closer to Manhattan. Flushing Bay is a natural habitat for waterfowl, including large birds like gulls who shelter in its wetlands and feed on the fish and shellfish in its tides and mudflats. Since these birds flock and soar, they may present a danger to the aircraft that take off and land at LaGuardia. Thus, over the years the owner of the airport, the Port Authority of New York and New Jersey, conducted studies of the habitat of these birds in an effort to control their population and minimize the danger they present to aircraft and the public. In 2000, the Port Authority, with assistance from the U.S. Department of Agriculture's ("USDA") Wildlife Services, conducted a year-long wildlife hazard assessment, culminating in the creation of a wildlife hazard management plan in 2002. Its studies, continued in the years that followed, and updates and modifications to its plan, were published from time to time. In 2009-2010, again with the assistance of Wildlife Services, the Port Authority conducted another year-long wildlife hazard assessment and issued its report on March 3, 2011, with a number of recommendations to mitigate the effects of wildlife on the airport's operations.

The Port Authority conducted these wildlife hazard assessments pursuant to federal regulations requiring airports holding a federal certificate to "take immediate action to alleviate wildlife hazards whenever they are detected." 14 C.F.R. § 139.337(a), (b). Airports are required to conduct a "wildlife hazard assessment" and submit their report to the FAA when

3

certain triggering events occur, such as multiple wildlife strikes or an engine ingestion of wildlife. The FAA can then order the airport to develop a "wildlife hazard management plan," to "[p]rovide measures to alleviate or eliminate wildlife hazards to air carrier operations." 14 C.F.R. § 139.337(d), (e). The plan is required to prioritize wildlife population management, habitat modification, and land use changes, and be reevaluated at least every 12 months. 14 C.F.R. § 139.337(f)(2) and (f)(6). If the FAA determines that the airport is not meeting its obligations and endangering air safety, the FAA can amend, modify, suspend, or revoke the airport's certificate. 49 U.S.C. § 44709(c).

In 2006, the New York City Department of Sanitation issued a Comprehensive Solid Waste Management Plan, to reduce pollution and deal more efficiently and economically with the 50,000 tons of garbage and recyclables that it collects each day. A central part of the plan proposed to reopen four shuttered marine trash-transfer stations on New York City waterways. Garbage would be trucked to the stations and loaded into sealed containers and onto barges for marine transfer to other collection points or final disposal sites. One of these stations is the North Shore Marine Transfer Station in College Point, Queens, on the shore of Flushing Bay, across an inlet from LaGuardia Airport.[1] The City proposed a three-level, fully enclosed facility operating under negative air pressure to contain smells of refuse within the structure and reduce attractions to birds to a minimum. Trash trucks were to drive into the facility through high-speed roll-up doors, dump their loads into watertight, leak-proof containers, and exit

---

[1] The North Shore Station was operated by the New York City Department of Sanitation between 1954 and 2001, and was then closed. The other three proposed renovated facilities are located on New York Bay in Brooklyn and on the East River at the terminus of East 91st Street in Manhattan.

4

through another set of such doors. The sealed and loaded containers were then to be transported via waterway to their destinations.

Upon a determination by the Secretary of Transportation that a proposed structure "may result in an obstruction of the navigable airspace or an interference with air navigation facilities and equipment or the navigable airspace, the Secretary shall conduct an aeronautical study to decide the extent of any adverse impact on the safe and efficient use of the airspace, facilities, or equipment." 49 U.S.C. § 44718(b). The Secretary has delegated to the FAA the responsibility of conducting such studies, and of determining if the proposed construction or "alteration of an existing structure," creates a hazard to air navigation. 14 C.F.R. §§ 77.29(a), 77.31(a). In reaching a Hazard or No Hazard determination, seven criteria are considered, including "the impact of a proposed structure . . . on aeronautical operations, procedures, and the safety of flight," "[a]irport traffic capacity," "[m]inimum obstacle clearance altitudes," and "the potential effect on ATC radar."[2] 14 C.F.R. § 77.29(a).

---

[2] (a) The FAA conducts an aeronautical study to determine the impact of a proposed structure, an existing structure that has not yet been studied by the FAA, or an alteration of an existing structure, on aeronautical operations, procedures, and the safety of flight. These studies include evaluating:

    (1) The impact on arrival, departure, and en route procedures for aircraft operating under visual flight rules;
    (2) The impact on arrival, departure, and en route procedures for aircraft operating under instrument flight rules;
    (3) The impact on existing and planned public use airports;
    (4) Airport traffic capacity of existing public use airports and public use airport development plans received before the issuance of the final determination;
    (5) Minimum obstacle clearance altitudes, minimum instrument flight rules altitudes, approved or planned instrument approach procedures, and departure procedures;
    (6) The potential effect on ATC radar, direction finders, ATC tower line-of-sight visibility, and physical or electromagnetic effects on air navigation, communication facilities, and other surveillance systems;

The proposed North Shore Station was the subject of two FAA-conducted aeronautical studies, in 2006 and 2008. Both resulted in findings of "No Hazard." On September 18, 2006, after its first study, the FAA determined that the proposed 110-foot-high facility "would have no substantial adverse effect on air navigation" provided it was equipped with the proper lights. The FAA added, however, that while the structure would not be a hazard, its location in LaGuardia's "runway protection zone" was "strongly discouraged in the interest of protecting people and property on the ground."[3]

The Port Authority, the owner of LaGuardia Airport, objected and petitioned the FAA for discretionary review. 14 C.F.R. § 77.37. In response, the City redesigned the proposed Station, lowering its height to 100 feet and moving it out of the runway protection zone. The Port Authority accepted the changes and withdrew its petition for review. Thus, the FAA's determination of No Hazard became final.

The alteration in the City's designs gave rise to a second FAA-conducted aeronautical study. Again, on September 19, 2008, the FAA issued a No Hazard determination, finding that "the structure would have no substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities," provided that it was equipped with proper lighting.[4] The FAA added that if the height of the proposed structure were to exceed 100 feet, that would result in a Hazard determination.

---

(7) The aeronautical effects resulting from the cumulative impact of a proposed construction or alteration of a structure when combined with the effects of other existing or proposed structures.

14 C.F.R. § 77.29(a).

[3] We granted petitioner's motion to take judicial notice of the 2006 and 2008 proceedings.

[4] *See* note 3.

Four months after the second No Hazard determination, U.S. Airways Flight 1549, taking off from LaGuardia Airport, flew into a flock of Canada Geese. The airplane's jet engines ingested several of the geese and stalled at an altitude of less than 3000 feet. The pilot, Capt. Chesley B. Sullenberger, and co-pilot, First Officer Jeffrey B. Skiles, ditched the aircraft in the Hudson River, and all passengers and crew were saved.[5] In the wake of the incident, on March 4, 2009, Queens County Congressman Gary Ackerman and other members of New York's congressional delegation wrote to FAA Acting Administrator Lynne Osmus, expressing concern that birds might be "eagerly gathering about and circling above" the proposed Station. The FAA responded, assuring that the Station would be safe, as it complied with FAA Advisory Circular 150/5200-33B. The Circular states, "Enclosed waste-handling facilities [that follow certain procedures] generally are compatible with safe airport operations, provided they are not located on airport property or within the Runway Protection Zone." However, the Congressmen were not assuaged.

In the fall of 2009 Secretary of Transportation Ray LaHood appointed a panel of experts from the FAA, USDA, U.S. Air Force, Port Authority, City, and an independent consulting firm, to "study the impact of the proposed [Station] on safe airport operations at LaGuardia Airport."[6] The blue ribbon panel reviewed current and historical wildlife data and surveys, including a history of bird strikes at LaGuardia Airport. It observed and studied the habits of birds near the proposed Station and at other operational trash transfer stations in the City, most particularly at the Staten Island Transfer Station, which has a similar building design

---

[5] *See* National Transportation Safety Board, Aircraft Accident Report 10/03, PB2010-910403.

and is in an area with a large gull population. The panel examined the design plans and operational parameters of the North Shore Station and conducted risk assessments of three different alternatives: no facility, the facility as planned, and the facility with wildlife mitigation measures in place. A draft report was issued, and comments from the public were solicited.

On September 2, 2010, the panel of experts issued its report.[7] The panel found that "changes to the building design, adherence to strict operational procedures, and the development and implementation of an integrated wildlife hazard management plan and program can reduce the hazards to aviation safety posed by birds attracted to the proposed facility." The panel concluded that its recommendations would "achieve compatibility between the [Station] and LaGuardia Airport with respect to bird strikes and safe air operations" and "greatly reduce the risk of a bird strike as compared to the present situation."

The FAA sent its report to the New York City Department of Sanitation, with a one-page cover letter dated the day the report was released, September 2, 2010. The Letter states, "The report concludes the proposed [North Shore Station] will be compatible with safe air operations so long as it is constructed and operated in accordance with the report's recommendations."[8] The Letter explains that the FAA reviewed the report and believed "the

---

[6] The authority to initiate the study derives from the Secretary's general powers, which allow him to "make reports," "conduct . . . studies," and "perform other acts the Secretary considers appropriate." 49 U.S.C. § 31133(a).

[7] Evaluation of the North Shore Marine Transfer Station and Its Compatibility with Respect to Bird Strikes and Safe Airport Operations at LaGuardia Airport, August 2010.

[8] The full body of the Letter reads:

> Last year, following the forced landing of U.S. Airways Flight 1549 in the Hudson River, Secretary LaHood requested that an expert technical panel reexamine whether the proposed North Shore Marine Transfer Station (MTS) in College Point, Queens, would be compatible with safe operations at LaGuardia

8

technical panel's approach to the issue presented was appropriate and its analysis and conclusions are sound. We believe it is important for the [C]ity to adopt the recommendations of the panel and we appreciate your undertaking to adopt them in full, and we urge you to commit to implementing the recommendations in full." The City responded that it accepted the recommendations and was proceeding with construction of the facility as recommended by the FAA.

## II.    **Procedural History**

Petitioners in this case, a general aviation pilot and a not-for-profit corporation interested in the safety of aviation, filed this petition for review on October 29, 2010, seeking

---

Airport. We were fortunate to be able to assemble a true "blue ribbon" panel, including experts in bird strike hazards from the United States Air Force, the Federal Aviation Administration, the United States Department of Agriculture, the city of New York, and the Port Authority of New York and New Jersey.

The panel issued its final report, "Evaluation of the North Shore Marine Transfer Station and its Compatibility with Respect to Bird Strikes and Safe Air Operations at LaGuardia Airport," on September 2. The report concludes the proposed MTS will be compatible with safe air operations so long as it is constructed and operated in accordance with the report's recommendations.

The FAA has reviewed the final report. We believe the technical panel's approach to the issue presented was appropriate and its analysis and conclusions are sound. We believe it is important for the city to adopt the recommendations of the panel and we appreciate your undertaking to adopt them in full, and we urge you to commit to implementing the recommendations in full.

Secretary LaHood and the FAA appreciate your cooperation with the work of the technical panel. We look forward to working with you to protect the safety of the region's airports.

FAA Director of Airport Safety and Standards, Michael J. O'Donnell, to Harry Szarpanski, Deputy Commissioner of NYC Department of Sanitation, Sep. 2, 2010.

review by this Court of the September 2, 2010, Letter from the FAA to New York City.[9] Petitioners alleged that they had a substantial interest in the Letter's subject matter, that the Letter was a final order reviewable by this Court, and that it was arbitrary and capricious. If the court has jurisdiction, we may "amend, modify, or set aside any part of the order." 49 U.S.C. § 46110(c).

On January 7, 2011, Respondents moved to dismiss the petition on the ground that the Letter was not an "order," and that the court of appeals therefore lacks subject matter jurisdiction to hear the petition. On April 6, 2011, a motions panel of this Court denied the motion to dismiss, holding that the Letter was an order subject to review pursuant to the provisions of 49 U.S.C. § 46110. Motion Order Denying Respondents' Motion to Dismiss, *Paskar v. U.S. Dep't of Transp.*, No. 10-4612-ag, Docket No. 61, (2d Cir. Apr. 6, 2011).

## III. Discussion

### a. Revisiting the Motions Panel Decision

A merits panel may revisit a decision made by a motions panel. *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999). "[R]eexamination of a question regarding our jurisdiction is especially important whenever there is reason to believe that it may be lacking." *Id.*

In denying Respondents' motion to dismiss, the motions panel found that it had jurisdiction to review the Letter from the FAA to New York City as a "final order." In support of its decision the motions panel cited *New York v. FAA*, 712 F.2d 806 (2d Cir. 1983), in which the

---

[9] Petitioners also filed suit in New York State Supreme Court to block construction of the Station. On November 28, 2011, their claims were dismissed. *Matter of Paskar v. New York State Dept. of Envtl. Conservation*, 33 Misc. 3d 1226A (N.Y. Sup. Ct. 2011).

FAA refused to amend the operating certificate of the Republic Airport in Suffolk County, New York, thereby denying New York State the ability to operate the airport. The court held that it had jurisdiction to review the FAA order because it was a "final order" which "impose[d] an obligation, denie[d] a right, or fixe[d] some legal relationship" among the interested parties. *Id.* at 808. As discussed below, the Letter in this case does not meet these qualifications.

The motions panel also cited *City of Rochester v. Bond*, 603 F.2d 927, 933 & n.27 (D.C. Cir. 1979), in which the D.C. Circuit held that No Hazard determinations are reviewable final orders. But, as will be discussed below, the FAA Letter at issue here is not a No Hazard determination.

Thus, we have cause to reexamine the motions panel's decision because "there is reason to believe that [our jurisdiction] may be lacking." *Rezzonico*, 182 F.3d at 149.

### b. Whether the Letter is a Reviewable Order

This Court has jurisdiction to review the FAA Letter if the Letter is an "order" within the definition of 49 U.S.C. § 46110(a). Pursuant to § 46110(a), "a person disclosing a substantial interest in an order" issued by the Administrator of the FAA "may apply for review of the order by filing a petition for review…in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business."[10] The Administrative Procedure Act defines an "order" as "the whole or a part of a final disposition…of an agency in a matter other than rule making." 5 U.S.C. § 551(6). Although the term "order" is to be given a "liberal construction," "only final orders are reviewable" under § 46110(a). *New York v. FAA*,

---

[10] We assume without deciding that petitioners, a pilot who flies in and out of LaGuardia Airport and a not-for-profit corporation concerned with air safety at LaGuardia, have a "substantial interest" in this matter.

712 F.2d at 808 (citing *McManus v. CAB*, 286 F.2d 414, 417 (2d Cir.), *cert. denied*, 366 U.S. 928 (1961)). A "final order" is one that "imposes an obligation, denies a right, or fixes some legal relationship." *New York v. FAA*, 712 F.2d at 808 (internal quotation marks omitted). A "final order" must satisfy two criteria: the agency action must mark the "consummation of the agency's decisionmaking process," and the action "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citing *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)) (internal quotation marks omitted). The Letter from the FAA to the City of New York does not satisfy these criteria.

No term in the Letter "imposes an obligation" on the City, "denies a right" of the City, or "fixes some legal relationship" with the City. *New York v. FAA*, 712 F.2d at 808. The Letter "urge[d]" the City to implement the panel report's recommendations and expressed the sentiment that the recommendations are "important for the city to adopt." However, there is nothing in the Letter that commands the City to stop, change, or continue construction of the North Shore Station. A letter advising the City to follow safety recommendations, without more, hardly "fixes a legal relationship." The City could have accepted or rejected the FAA's recommendations without recourse by any party. Petitioners do not contest this point, and have presented no authority that holds otherwise. Although the City accepted the panel's recommendation to adopt certain wildlife hazard mitigation measures, including removing ledges on which birds like to perch, the City did not have to do so. The FAA could not have required the City to alter its designs of the Station, nor denied the City's right to build it, nor imposed an

12

obligation to institute wildlife management procedures. *Aircraft Owners & Pilots Ass'n v. FAA*, 600 F.2d 965, 967 (D.C. Cir. 1979). Indeed, "[t]he FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation." *Id*.

We recognize that other circuits have held that a letter may be a reviewable final agency action, provided, of course, that the letter imposes tangible, definite, and immediate legal consequences. *See, e.g., San Diego Air Sports Ctr., Inc. v. FAA*, 887 F.2d 966, 970 (9th Cir. 1989) (holding that a letter banning parachuting near San Diego airport was a final order because it created an "immediate, substantive rule"); *Air One Helicopter, Inc. v. FAA*, 86 F.3d 880, 882 (9th Cir. 1996) (holding that an FAA letter denying Air One the right to register its helicopter in the United States was a final order because "it would be futile for Air One to attempt to persuade the FAA to change the position it clearly sets forth" in the letter and federal law requires helicopters register with the FAA); *S. Cal. Aerial Advertisers' Ass'n v. FAA*, 881 F.2d 672, 677 (9th Cir. 1989) (holding that a letter from an FAA official banning fixed-wing aircraft travel through shoreline area was final agency action because it was a "definitive statement of the FAA's position that had a direct and immediate effect on petitioner's members and that carried an expectation of immediate compliance"). The Letter here had no such fixed consequences for the City of New York, for it imposed no obligation, denied no right, and fixed no legal relationship. *See Red River Transp. & Dev. Co., Inc. v. FAA*, 630 F.2d 592, 594 (8th Cir. 1980) (holding that FAA letter directing air freight company to comply with regulations regarding ice protection equipment on planes was not a final order because the letter was "tentative [in] nature" and administrative remedies regarding request to comply had not been exhausted).

13

This case is similar to *Air California v. United States Dep't of Transp.*, 654 F.2d 616 (9th Cir. 1981), in which the Ninth Circuit held that a letter from the FAA's chief counsel did not constitute a reviewable order because it lacked requisites of finality. In that case, in an effort to reduce noise near the Orange County Airport, the Orange County Board of Supervisors limited the number of airline carriers permitted to fly into the airport. In response to the complaints of disappointed competitors, the FAA issued a report concluding that denying other airlines access to the airport violated FAA-administered, federal statutes. The report also contained a number of suggestions for reducing noise around the airport. The FAA's chief counsel sent a letter to the Board of Supervisors endorsing the report and noting that failure to negotiate with new airline carriers would "warrant [the FAA's] pursuance of contractual, injunctive, and civil penalty remedies." *Id.* at 618 (internal quotation marks omitted). Despite the fact that the letter threatened to impose penalties and suggested that the FAA might withhold federal funding from the airport for continued noncompliance, the Ninth Circuit held that the letter was not a final order because it was "neither a definitive statement of the agency's position nor a document with the status of law." *Id.* at 620. "The letter did not specify the exact form that compliance would take…." *Id.* Although the Board of Supervisors ultimately agreed with the FAA, the court noted that the Board could have challenged the FAA in subsequent enforcement actions. Thus, the letter did not "impose an obligation, deny a right, or fix some legal relationship." *Id.* at 621.

Petitioners argue that the Letter had a "substantial practical impact," imposing a de facto obligation on the City. In *Aircraft Owners*, the D.C. Circuit held that it had jurisdiction to review the FAA's determination that a television antenna tower proposed to be built near three

14

Virginia airports posed "No Hazard" to air navigation. In that case, the FAA had found that the antenna tower would not constitute an "obstruction of the navigable airspace or an interference with air navigation facilities and equipment or the navigable airspace." 49 U.S.C. § 44718(b). The D.C. Circuit held that it had jurisdiction to review the FAA order. The FAA's Hazard/No Hazard determination as to the television antenna tower would affect the decision of another agency, the Federal Communications Commission, whether or not to issue a permit necessary for the tower's construction. Since the FAA's determination had this "substantial practical impact," it had sufficient legal force for the D.C. Circuit to hold that it was a final order that it could review. *Aircraft Owners*, 600 F.2d at 966-67. *See also Town of Barnstable v. FAA*, 659 F.3d 28, 32 (D.C. Cir. 2011) (FAA No Hazard determination was prerequisite for obtaining Department of Interior lease to an offshore windfarm). The court of appeals applied the ruling of the U.S. Supreme Court that an agency action, in order to constitute a "final order," must be one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks omitted); *see also Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007) ("To be deemed 'final' and thus reviewable as an order under 49 U.S.C. § 46110, an agency disposition…must determine rights or obligations or give rise to legal consequences.").

Whatever the reviewability of a Hazard/No Hazard determination generally, our task in the case before us is to determine the reviewability of a one-page Letter to the City which states agreement with the recommendations made in a panel report. The Letter differs from a Hazard/No Hazard determination in the legal authority which underlies it and in the practical effect emanating from it. The panel report was commissioned by the Secretary of Transportation

15

pursuant to his general powers, 49 U.S.C. § 31133(a). It was a report of experts appointed from a number of federal, state, and city agencies. It was not a Hazard/No Hazard determination nor a wildlife hazard assessment, the two types of FAA proceedings that evaluate potential dangers to air navigation. *See* 14 C.F.R. §§ 77.31, 139.337(b). The report followed two FAA aeronautical studies of the North Shore Station, both concluding in No Hazard determinations, and numerous wildlife hazard assessments ordered and carried out by the Port Authority and the USDA. The Letter does not affect any other federal agency, as did the No Hazard determination in *Aircraft Owners*, nor "alter the legal regime" to which the City is subject, or affect any permit or lease of the Station.[11] *Bennett*, 520 U.S. at 178.

        c.   **The Fifth Circuit's "Moral Suasion" Test**

The Fifth Circuit has espoused a "moral suasion" test whereby an order having sufficient moral force is deemed a reviewable final order. *See Air Line Pilots' Ass'n Int'l v. DOT*, 446 F.2d 236, 240-41 (5th Cir. 1971); *Menard v. FAA*, 548 F.3d 353, 357 (5th Cir. 2008). That is not the test in the Second Circuit. However, even if we were to apply the "moral suasion" test, petitioners' claims would still fail because the FAA Letter did not impose "a practical stumbling block to the construction" of the North Shore Station and was consistent with the FAA's two prior No Hazard determinations. *Air Line Pilots*, 446 F.2d at 241 (internal quotation marks omitted). In *Air Line Pilots*, the FAA determined that the construction of three high-rise complexes near Love Field, Dallas, posed No Hazard to air navigation. The Fifth Circuit set aside the No Hazard determination, holding that the determination was reviewable because the

---

[11] The City made the changes to the design and operations of the Transfer Station recommended by the FAA Letter, and asked the New York State Department of Environmental Conservation to

16

"moral suasion" of the Hazard/No Hazard determination would either erect or remove "a practical stumbling block to the construction of the proposed buildings." *Id.* "[A]s a practical matter, it would unquestionably have been very difficult for the proponents of the proposed structures to secure financing or obtain insurance on a building that officially had been declared a 'hazard to air navigation.'" *Id.*

In the present case, the FAA Letter does not pose a practical "stumbling block" to the construction of the North Shore Station. The Letter is not a No Hazard determination. FAA aeronautical studies in 2006 and 2008 had already determined that the Station posed No Hazard to air navigation. The panel report was consistent with those determinations, and neither created, nor removed, a "stumbling block." Nothing in the recommendations of the panel, or the Letter, ordered the City to do anything, or to desist from doing anything. No other regulatory agency awaited the issuance of the panel report, and no financing or insurance was conditioned on the content of the Letter. To the extent that the Fifth Circuit has announced a definition of a "final order" inconsistent with our understanding of the term, *see New York v. FAA*, 712 F.2d at 808, we decline to follow it.

## IV. Conclusion

The FAA letter and inter-agency panel report did not deny a right, impose an obligation, or have legal consequence. It was not a "final order," and we lack jurisdiction to review it. The petition for review is **DISMISSED**.

---

reflect the changes in the permit it issued. The changes were not the legal consequence of any order.