**BFI WASTE SYSTEMS OF NORTH AMERICA, INC., Petitioner,**

v.

**FEDERAL AVIATION ADMINISTRATION, Respondent.**

**No. 01–1152.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 15, 2002.

Decided June 18, 2002.

Michael S. McCarthy argued the cause for the petitioner. Michael S. Freeman was on brief.

Jeffrica Jenkins Lee, Attorney, United States Department of Justice, argued the cause for the respondent. Robert S. Greenspan, Attorney, United States Department of Justice, was on brief. Christine N. Kohl, Attorney, United States Department of Justice, entered an appearance.

Before: SENTELLE, HENDERSON and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

Opinion concurring in part and dissenting in part filed by Circuit Judge TATEL.

KAREN LeCRAFT HENDERSON, Circuit Judge:

BFI Waste Systems of North America, Inc. (BFI), petitions for review of a Federal Aviation Administration (FAA) decision, *see* Appendix for Petitioner (JA) at 5–9 (Affirmation), affirming the FAA's earlier determination that BFI's proposed expansion of a landfill near Denver International Airport (DIA) would be a hazard to air navigation, *see id.* at 207–09 (Hazard Determination or Determination). BFI claims, *inter alia,* that the Affirmation and Determination are arbitrary, capricious and otherwise unlawful and that the substantive findings underlying them are unsupported by substantial evidence in the administrative record. We agree and therefore grant the petition for review.

## I.

The following factual recitation is divided into two sections—the first explaining the regulatory regime of the FAA and the second detailing how BFI's landfill proposal was (or was not) processed within that regime.

### A.

Under the Federal Aviation Act of 1958 (Act), the FAA is authorized to determine whether a proposed construction or alteration project will present a hazard to air navigation. The Act states that the FAA "[b]y regulation . . . shall require a person to give adequate public notice [of] . . . the proposed construction, alteration, establishment, or expansion, of a structure or sanitary landfill when the notice will promote . . . (1) safety in air commerce; and (2) the efficient use and preservation of the navigable airspace and of airport traffic capacity at public-use airports." 49 U.S.C. § 44718(a). Pursuant to its statutory authority, the FAA has promulgated regulations requiring a project sponsor to notify the FAA when the sponsor proposes, *inter alia,* any alteration resulting in a sanitary landfill "of more than 200 feet in height above the ground level at its site." 14 C.F.R. § 77.13(a)(1). Under the regulations, "[e]ach person who is required to notify the [FAA] under § 77.13(a) shall send [to it] one executed form set (four

copies) of FAA Form 7460–1, Notice of Proposed Construction or Alteration." 14 C.F.R. § 77.17(a). The information contained in the Form 7460–1 is meant to provide the FAA with a basis for determining "the possible hazardous effect of the proposed construction or alteration on air navigation." 14 C.F.R. § 77.11(b)(2).

In addition to setting out notice requirements, the regulations provide the standards by which alteration proposals are evaluated. For instance, Subpart C of the regulations "establishes standards for determining obstructions to air navigation" and "applies to existing and proposed manmade objects, objects of natural growth, and terrain." 14 C.F.R. § 77.21(a). Subpart C states that a proposed manmade object, like a landfill, is "an obstruction to air navigation" if it is "500 feet above ground level at the site of the object," 14 C.F.R. § 77.23(a)(1), or if it is "200 feet above ground level ... within 3 nautical miles of the established reference point of an airport, excluding heliports," 14 C.F.R. § 77.23(a)(2). Under FAA Order 7400.2D, "Procedures for Handling Airspace Matters" (Sept. 16, 1993) (FAA Handbook)—a binding set of FAA guidelines, *see D&F Afonso Realty Trust v. Garvey,* 216 F.3d 1191, 1196 (D.C.Cir.2000) (FAA Handbook is "controlling")—a proposed object that exceeds the standards of Subpart C is presumed to have a substantial adverse effect on the use of airspace and is therefore "presumed to be [a] hazard[ ] to air navigation unless an aeronautical study determines otherwise." FAA Handbook ¶ 7–1(b).

The Act and the regulations require the FAA, in certain circumstances, to conduct an aeronautical study to determine the extent of any adverse impact on the use of airspace. The relevant provision of the statute provides that

> [u]nder regulations prescribed by the Secretary [of Transportation], if the [FAA] decides that constructing or altering a structure may result in an obstruction of the navigable airspace or an interference with air navigation facilities and equipment or the navigable airspace, [it] shall conduct an aeronautical study to decide the extent of any adverse impact on the safe and efficient use of the airspace, facilities, or equipment.

49 U.S.C. § 44718(b)(1). Pursuant to this statutory authority, the Secretary has prescribed Subpart D, which provides that

> [t]he Regional Manager, Air Traffic Division of the region in which the proposed construction or alteration would be located ... conducts [an] aeronautical study [that] ... may include the physical and electromagnetic radiation effect the proposal may have on the operation of an air navigation facility....

> To the extent considered necessary, the Regional Manager ... [s]olicits comments from all interested persons; ... [e]xplores objections to the proposal and attempts to develop recommendations for adjustment of aviation requirements that would accommodate the proposed construction or alteration; [and] ... [c]onvenes a meeting with all interested persons for the purpose of gathering all facts relevant to the effect of the proposed construction or alteration on the safe and efficient utilization of the navigable airspace.

14 C.F.R. § 77.35(a), (b). Once an aeronautical study has been initiated, the FAA applies all of its "operational, procedural and electronic" standards (including those pertaining to radar coverage) to "determine if the object being studied would actually be a hazard to air navigation." FAA Handbook ¶ 7–1(b); *see id.* ¶ 7–3 ("An object to be considered for adverse aeronautical effect must first exceed the obstruction standards of Subpart C ...

and/or be found to have physical or electromagnetic radiation effect on the operation of air navigation facilities."). Upon the study's conclusion, the Regional Manager issues a hazard/no-hazard determination. *See* 14 C.F.R. § 77.35(c). In order to issue a hazard determination, the Regional Manager "must find by a clear showing that the [object] in question will have a 'substantial adverse effect' on air navigation." *D&F Afonso*, 216 F.3d at 1195 (citing FAA Handbook ¶ ¶ 7–2 to 7–5, 8–2); *see also* FAA Handbook Fig. 4–23[9]. The Regional Manager's determination is final unless the FAA grants discretionary review. *See* 14 C.F.R. § 77.37.

■ A hazard/no-hazard determination has "no enforceable legal effect." *Aircraft Owners & Pilots Ass'n v. FAA*, 600 F.2d 965, 966 (D.C.Cir.1979). The FAA lacks authority to prohibit a construction or alteration it believes to be hazardous to air navigation.[1] *See id.* at 967. Nonetheless, a hazard determination can hinder the project sponsor in acquiring insurance, securing financing or obtaining approval from state or local authorities. *See id.*

### B.

BFI is a waste disposal company that operates solid waste landfills in Colorado, including the Tower Road landfill at issue here. The Tower Road landfill is located approximately two miles west of DIA in Commerce City, Colorado. Before 1999 BFI had permission from state and local authorities to extend the landfill vertically to 119 feet above ground level (AGL) at its tallest point. In February 1999 BFI obtained state and local authorization to increase the landfill's height by 157 feet (to 276 feet AGL) over a period of 40–60 years. Thus, as of March 1999, the FAA's regulatory approval was the final approval needed in order to expand.

On March 16, 1999 BFI representatives met with an official from the FAA's Denver Airports District Office (ADO). At the meeting, BFI submitted a preliminary FAA Form 7460–1 to the FAA and the attendees discussed the proposal's potential impact on airport traffic and radar operations. Emphasizing "the need to perform analysis" before drawing conclusions, the ADO informed BFI that "[t]he degree of impact to the [airport surveillance radar] line of sight will need to be studied and no commitments [are being] made at this time." JA 47. On April 16 BFI formally submitted a Form 7460–1 to the FAA's Northwest Mountain Region regarding the 157–foot alteration proposal. The FAA received the form, at the earliest, on April 22. On April 26 the FAA's Northwest Mountain Region issued a notice that it intended to conduct an aeronautical study to determine the effect of the landfill expansion on air navigation. At no time did the FAA "circularize" the aeronautical study notice to interested parties or even to BFI.[2] On May 26 Tower Road landfill officials met with ADO representatives who briefly toured the landfill. Although the record recites that potential radar effects were "currently being reviewed," *id.* at 83, it does not state that radar issues were in fact discussed at the meeting.

---

**1.** We must therefore resolve the question whether on the record before us BFI has Article III standing to challenge the Hazard Determination and the Affirmation. *See infra* Part II.

**2.** The FAA generally "circulariz[es] a notice of aeronautical study" by "notify[ing] interested persons of the study being conducted" *via* FAA Form 7460–8. FAA Handbook ¶ 5–21. Circularization "provides the opportunity for interested persons to participate [in the study] by submitting comments for consideration." *Id.*

On August 30, 1999 the FAA's Northwest Mountain Region issued the Hazard Determination, which consisted of a form cover letter and a one-page summary of findings. The Determination identified five adverse impacts on the safe and efficient use of navigable airspace at DIA: (1) birds attracted to the landfill could interfere with aircraft; (2) large dump trucks and other heavy equipment operating on the landfill could block or reflect radar signals; (3) the increased size of the landfill could cause interference with radar coverage for aircraft executing "missed approaches" on Runway 29 at nearby Jefferson County Airport; (4) the increased size of the landfill could cause interference with radar coverage of the missed approach points for DIA Runway 26 and, during certain weather conditions, DIA Runways 35L and 35R; and (5) the increased size of the landfill could cause interference with radar coverage for lifeguard, police, media and business helicopters operating in downtown Denver, 20 miles southwest of the landfill. Because DIA "currently handles more than 1.5 million aircraft operations a year," the Determination stated, "the impacts, taken individually or cumulatively," have a substantial adverse effect on the use of airspace and "are determined to be Hazards to Air Navigation." *Id.* at 209. On September 28, 1999 BFI filed a petition for administrative review of the Hazard Determination. On March 3, 2000 the FAA granted review. The FAA's notice of review invited interested persons to submit comments to the FAA and BFI did so.

On July 25, 2000 the FAA affirmed its initial Hazard Determination. The Affirmation first abandoned several of the findings made in the Determination, concluding that neither bird problems nor interference with radar coverage of Jefferson County Airport or of DIA Runways 26, 35L or 35R would result from BFI's landfill alteration. The Affirmation did,

however, affirm two of the Determination's five findings of adverse effect: (1) vehicles on top of the landfill at its maximum height could cause radar reflections; and (2) radar coverage of helicopters could be limited. Furthermore, the FAA based its Affirmation on two adverse effects not mentioned in the Determination, i.e., the possibility that BFI's proposal would affect radar coverage of (1) DIA Runway 25 and (2) proposed but unbuilt DIA Runway 25L.

On September 22, 2000 BFI timely petitioned for review.

## II.

■ On March 1, 2002 we ordered the parties to submit simultaneous briefs addressing the question of BFI's constitutional standing to pursue its claims in light of the advisory nature of the FAA's Hazard Determination and Affirmation. We now conclude that on the record before us BFI has satisfied Article III's standing requirements—i.e., it has shown that it has suffered or will suffer "an injury in fact" which is "concrete and particularized," "actual or imminent," "fairly ... trace[able] to the challenged action" and "redress[able] by a favorable decision," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (internal quotations omitted); *see D&F Afonso*, 216 F.3d at 1193–94.

Pursuant to Colorado law, *see* C.C.R. 1007–2, § 1.6.1, BFI applied to the city council of Commerce City for a "certificate of designation" permitting it to expand the Tower Road landfill. Under C.C.R. 1007–2, § 1.6.2–.6, the Colorado Department of Public Health and Environment (CDPHE) provided Commerce City with a required report on BFI's proposal, stating that the expansion would comply with applicable environmental laws, provided that "[a]ny restriction of elevation imposed by FAA under applicable federal law ... [is] hon-

ored." JA 454. Relying on the CDPHE report, the city council approved BFI's expansion proposal with the express caveat that if the FAA determined "there is a problem," the council "has authority to review the certificate of designation to determine if the approval needs to be reconsidered, and changes made as necessary." *Id.* at 457. Because, as we noted earlier, an FAA hazard determination itself has "no enforceable legal effect," *Aircraft Owners & Pilots Ass'n,* 600 F.2d at 966, it does not function as a "restriction" on landfill elevation in the same way that a binding federal statute or regulation would. Nonetheless, a hazard determination is the only means by which the FAA can "restrict[ ]," within the meaning of the CDPHE report, the elevation of the Tower Road landfill. Accordingly, we conclude that the CDPHE report, which was incorporated into the city council's approval, expressly conditioned BFI's certificate of designation on the FAA's non-issuance of a hazard determination. We therefore credit BFI's allegation—supported by the declaration of its regional vice-president in charge of the Tower Road landfill—that it faces a concrete, imminent injury from the reopening and modification of the state and local approvals as a result of the Hazard Determination. Plainly, the injury is "fairly ... trace[able] to the challenged action"—that is, the FAA's alleged arbitrary and capricious decisionmaking—and it is "redress[able] by a favorable decision," one vacating and remanding the Determination and Affirmation. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136–37.

## III.

Having determined that BFI's petition for review is properly before us, we now turn to the FAA's Determination and Af-

firmation to determine whether, based on the administrative record, they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The FAA's determinations are arbitrary and capricious if, *inter alia,* they are "not supported by substantial evidence" in the record as a whole. *Motor Vehicle Mfrs. Ass'n v. Ruckelshaus,* 719 F.2d 1159, 1164 (D.C.Cir.1983); *see* 49 U.S.C. § 46110(c). We address BFI's two major claims in turn.

### A.

First, BFI contends that the Determination and Affirmation were arbitrary, capricious and otherwise unlawful because the FAA violated its own standards in (1) conducting an aeronautical study without "circularizing" notice thereof and without negotiating with BFI to identify mitigation measures that could eliminate purported adverse effects; and (2) failing to give BFI notice of the two new issues it relied on in affirming the Determination. Both prongs of BFI's first contention are meritorious.

■ When the FAA conducts an aeronautical study, it must

> *[t]o the extent considered necessary ...* [s]olicit[ ] comments from all interested persons; ... [e]xplore[ ] objections to the proposal and attempts to develop recommendations for adjustment of aviation requirements that would accommodate the proposed construction or alteration; [and] ... [c]onvene[ ] a meeting with all interested persons for the purpose of gathering all facts relevant to the effect of the proposed construction or alteration on the safe and efficient utilization of the navigable airspace.

14 C.F.R. § 77.35(b) (emphasis added). Here, the FAA performed none of these tasks.[3] Nor did it explain its reasons for

---

**3.** The only point at which the FAA invited comments—in its notice of review—occurred *after* it issued the Hazard Determination, i.e.,

after it had already acted arbitrarily in failing to solicit comments.

declining to do so. The government argues that the "to the extent considered necessary" language of section 77.35 gives the agency discretion *not* to perform the tasks. Its argument, however, ignores the Act, the FAA Handbook and the relevant case law. As the Eighth Circuit has held, section 77.35 "must be interpreted to *require* the FAA to provide interested persons with an opportunity to comment upon proposed construction where notice would promote air safety *and efficiency.*" *White Indus., Inc. v. FAA,* 692 F.2d 532, 535 (8th Cir.1982) (emphasis added). The *White* holding is unsurprising given that the FAA's authority derives from its statutory mandate "to insure the safe *and efficient* use of airspace." *Id.* (emphasis added); *see* 49 U.S.C. § 44718. The Handbook states that "[n]ormally, any propos[al] that would affect an airport or require a change in aeronautical operations or procedures should *always* be circularized" and it then enumerates six specific circumstances, not applicable here, in which "[c]ircularization should not be necessary." FAA Handbook ¶ 5–20 (emphasis added). Because circularization helps "[e]xplain the probable effects of [a] proposal in sufficient detail to assist interested persons in formulating comments on how the proposal would affect aeronautical operations," *id.* ¶ 5–21, it is an essential step in determining how to tailor the sponsor's proposal to strike a proper balance between safety interests *and* efficiency interests. *See Greater Orlando Aviation Auth. v. FAA,* 939 F.2d 954, 961 (11th Cir.1991) (FAA obliged "to do more than just pay lip service" to comments endorsing potential non-aviation uses of navigable airspace).

The FAA's unexplained failure to solicit comments as directed by the Handbook was arbitrary and capricious, *see D&F Afonso,* 216 F.3d at 1195 ("[T]he requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result."

(quotations omitted)), especially in light of the fact that FAA staff members themselves believed it would be helpful. if BFI suggested possible solutions to the agency's radar coverage concerns, *see* JA 89. The brief March 16, 1999 meeting—which occurred before BFI formally filed its proposal and before the FAA's decision to conduct an aeronautical study—does not substitute for an opportunity, open to *all* interested parties, to submit written comments on the proposal.

Moreover, the FAA acted arbitrarily and capriciously in failing to negotiate with BFI, pursuant to 14 C.F.R. § 77.35(b), a compromise "accommodat[ion]" plan that would resolve anticipated impacts of the proposal. The Handbook explicitly requires the FAA, in circumstances where the "proposed structure may create harmful electromagnetic interference," to "meet and informally discuss alternatives" with the project sponsor and to provide the sponsor "adequate time to consider the problems and alternatives." FAA Handbook ¶ 7–35(f); *see id.* ¶ 5–12 (FAA must "attempt to negotiate a solution to any adverse effect on aeronautical operations . . . with the construction sponsor"). The FAA correctly observes that "neither the regulations nor the [Handbook] prescribe any set number of meetings or negotiation sessions that the FAA must conduct with a proponent." Br. of Resp't at 21. Therefore, it asserts, the March 16, 1999 meeting itself satisfied any duty the FAA might have. The agency is mistaken. The March meeting occurred *before* BFI formally submitted a Form 7460–1 and, therefore, before the FAA's duty to negotiate even arose. Indeed, the March meeting took place several weeks before the FAA studied the landfill's impact on radar coverage and, therefore, well before any meaningful give-and-take with BFI would have been possible. In any event, nothing in the record suggests that a substantive

discussion ever came to pass, either on March 16 or at any time thereafter.

Finally, the FAA acted arbitrarily and capriciously in failing, without explanation, to inform BFI in the notice of review of two issues it ultimately relied on in affirming the initial Hazard Determination. Where, as here, the FAA decides to conduct review without a hearing, the Handbook requires it to advise interested parties of the specific issues to be considered. *See* FAA Handbook ¶ 8–58. Pointing to the notice of review as well as a telephone call from the FAA to counsel for BFI,[4] the agency claims that it "substantially complied" with the Handbook's requirement and properly notified BFI that the adverse impact on radar coverage of DIA Runway 25 and proposed Runway 25L were issues it planned to consider. *See* Br. of Resp't at 23–27. The record belies the FAA's assertion. The notice of review states that the FAA was to "consider all material relevant to the question whether the proposed construction would have a substantial adverse effect on the safe and efficient use of the navigable airspace." JA 102. Notice at such a high level of generality is not notice at all, *cf. McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 197, 69 S.Ct. 497, 502, 93 L.Ed. 599 (1949) (Frankfurter, J., dissenting) ("Ambiguity lurks in generality and may thus become an instrument of severity."); the Handbook states that "the notice of review shall ... advise of the *specific* issues which are to be considered." FAA Handbook ¶ 8–58 (emphasis added). And the FAA's telephone conversation with BFI, whatever its content, is insufficient as a matter of law to put BFI on notice; the Handbook states that "*the notice of review* shall ... advise of the

specific issues which are to be considered." *Id.* (emphasis added).

**B.**

▮▮▮ Next, BFI contends that the "FAA's factual conclusions about the landfill's continued operation are as flawed as the procedures [it] used to reach them." Br. of Pet'r at 20. We agree. A hazard determination must be based on "a clear showing of substantial adverse effect" and, in the determination itself (not simply in its appellate brief), the FAA must "adequately explain its result." *D&F Afonso*, 216 F.3d at 1195–96; *see SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."). This it failed to do. The two findings of adverse impact upon which the Affirmation was based *and* of which BFI had notice—first, vehicles at the top of the landfill at its maximum height could cause radar reflections and, second, radar coverage of helicopters could be limited—are unsupported by substantial evidence in the record.

In the Hazard Determination and Affirmation, the FAA found that the Tower Road landfill at its proposed height "would be in the radar line of sight and vehicles [i.e., dumptrucks and graders] operating at the landfill may cause radar reflection and consequently create false targets." JA 7. The Determination and Affirmation themselves provide no evidentiary basis for the "false target" finding. Indeed, we can find at most only two pages in a 462–page record to support it—the FAA's aeronautical study reports that

---

4. The FAA is referring to its "contact[ing] petitioner's counsel by telephone to inquire whether [a scientific study] submitted as an attachment to petitioner's April 20, 2000 com-

ments 'took into consideration the plans on file to build new runways at Denver International Airport.'" Br. of Resp't at 26 (quoting JA 25).

Airways Facility radar technicians have ... identified the potential for false targets. At the current elevation of 5,423' AMSL [above mean sea level], the landfill is below the radar line-of-sight. At the new height of 5,542' AMSL, the large dump trucks, graders, and other heavy equipment create the potential for reflecting the radar and causing false targets.... The impact in this circumstance would be an erroneous position indication for the aircraft.

JA 32, 38. The foregoing "evidence" amounts to little more than a conclusion. In light of the equally plausible evidence BFI presented—an Ohio University aeronautical study concluding that "[a]nalysis of movement of a truck on top of the landfill at the proposed maximum height does not show any appreciable effect on radar operations due to signal reflections," JA 445—we cannot say that the FAA made "a clear showing" that BFI's proposal will have a substantial adverse impact on air navigation because of radar reflections. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

Nor can we conclude that the FAA has clearly shown or adequately explained why "the landfill would have a substantial adverse effect on visual flight rules (VFR) operations in Class B airspace" in that

DIA "would no longer have the ability to provide safety and traffic advisory services to" helicopters and law enforcement aircraft. JA 6–7. Once again, the FAA's aeronautical study provides only conclusory evidence; it reports that "[t]he increase in the height of the landfill will raise radar coverage to 7000' MSL, resulting in an inability to provide safety advisory services" to these low–altitude aircraft. JA 32. Once again, BFI furnishes credible evidence to the contrary; its radar plots (along with the FAA's) indicate that the rather limited area for which the landfill would raise the radar coverage floor above 7000' MSL—an area that is more than 20 miles from DIA—is not even *within* DIA's Class B airspace because it is too far from the airport. *See* JA 113, 126–27, 450–52.

## IV.

For the foregoing reasons, we conclude that the FAA acted arbitrarily and capriciously in issuing the Hazard Determination and Affirmation.[5] Accordingly, we grant the petition for review, vacate the Determination and Affirmation and remand the case to the FAA with instructions to reconsider BFI's proposal in accordance with the procedures set forth in the Act, the FAA regulations and the FAA Handbook and in accordance with this opinion.[6]

*So ordered.*

---

5. We do not reach BFI's argument that the FAA violated the Due Process Clause of the Fifth Amendment to the United States Constitution in basing its Affirmation on two adverse effects not mentioned in the Determination, i.e., the possibility that BFI's proposal would affect radar coverage of (1) DIA Runway 25 and (2) proposed but unbuilt Runway 25L. *Cf. United Auto., Aerospace & Agric. Implement Workers of Am. v. Nat'l Right to Work Legal Def. & Educ. Found., Inc.*, 590

F.2d 1139, 1148 (D.C.Cir.1978) (practice of avoiding constitutional questions "reflects a court's duty 'of not needlessly projecting delicate issues for judicial pronouncement'" (quoting *United States v. Rumely*, 345 U.S. 41, 45–46, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1953))).

6. In light of our disposition, we dismiss as moot BFI's motion to supplement the administrative record.

TATEL, Circuit Judge, concurring in part and dissenting in part:

I agree that the FAA acted arbitrarily and capriciously by failing to provide BFI with adequate notice concerning the two new grounds on which the agency rested its final hazard determination and that the record lacks substantial evidence to support two findings of adverse impact. *See* Maj. Op. at 534–35. In view of the considerable deference we owe the agency, however, I do not agree that the FAA acted arbitrarily and capriciously by "conducting an aeronautical study without 'circularizing' notice thereof and without negotiating with BFI to identify mitigation measures." *Id.* at 532. Because of this, and because the FAA may be able to explain its decision, I would not vacate the order, but would instead remand to the agency for further consideration. *See Allied–Signal, Inc. v. United States Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.Cir. 1993) (noting that "[a]n inadequately supported rule … need not necessarily be vacated," particularly where the agency may well "be able to explain" its decision).

My colleagues' conclusion that the FAA acted arbitrarily and capriciously by failing to circularize notice rests on their view that applicable regulations require the agency to solicit comments from all interested persons. Maj. Op. at 532. The regulation, however, calls for solicitation of comments only "[t]o the extent considered necessary." 14 C.F.R. § 77.35(b). Attempting to make this obviously discretionary provision seem mandatory, the court places the word "must" before its quotation of the regulation. Maj. Op. at 532. But even with this judicially added imperative, the regulation remains entirely discretionary—the agency "must" circularize "[t]o the extent considered necessary."

Were there any doubt about this, the FAA interprets its regulation as "not man-dat[ing] that the FAA solicit comments." Resp't's Br. at 15. We, of course, owe substantial deference to an agency's interpretation of its own regulation, *see Air Transp. Ass'n of Am., Inc. v. FAA,* 291 F.3d 49 (D.C.Cir.2002)—a principle recognized nowhere in the court's opinion. Moreover, we have no indication that the FAA's interpretation reflects anything other than its "fair and considered judgment," *Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997); *see also Drake v. FAA,* 291 F.3d 59 (D.C.Cir. 2002) (holding that we owe deference to an agency's interpretation of its own regulations expressed during litigation).

In support of their interpretation of the regulation, my colleagues point to the Federal Aviation Act, an Eighth Circuit decision, and the FAA Handbook. The only statutory language they cite, however, is the generic requirement that the FAA ensure "the safe and efficient use of … airspace." 49 U.S.C. § 44718(b)(1). The Eighth Circuit did not reach its decision in the face of a contrary agency interpretation—as this court now has—nor did it mention the "to the extent considered necessary" language. And the FAA Handbook's recommendation that "*normally,* any proposal that would affect an airport or require a change in aeronautical operations or procedures should always be circularized," FAA Handbook ¶ 5–20 (emphasis added), is consistent with the agency's view that the obligation is discretionary.

Moreover, even if the regulation required circularization, the record contains substantial evidence that the FAA did just that. In April 1999, the FAA issued a notice to BFI stating that "we are in the process of conducting an aeronautical study to determine the effect on air navigation." Although it is true that the FAA failed to provide "an opportunity, open to *all* interested parties, to submit written

comments," Maj. op. at 534, BFI nowhere raises the concerns of any one other than itself, nor would it have standing to do so, *see Nat'l Capital Airlines v. Civil Aeronautics Bd.*, 419 F.2d 668, 676–77 (D.C.Cir.1969) (rejecting a petition for review based on CAB's failure to follow its own procedures because that failure did not harm the petitioner).

As to the second basis for the court's arbitrary and capricious finding—that the FAA failed to negotiate with BFI over possible mitigation measures—substantial record evidence indicates that even if the agency has such an obligation, the required negotiation took place on not one but two occasions: in March and May 1999. The record of the March meeting expressly states that "[a]nticipating mitigation, potential options were discussed, [e.g.,] moving radar[.]" True, the March meeting occurred before the FAA issued its notice of proposed study, *see* Maj. Op. at 533, but neither the FAA regulation nor the handbook requires that negotiations take place at any particular time. My colleagues, moreover, never even mention the May meeting. Although the record might support the conclusion that there was no "meaningful give–and–take" between BFI and the FAA, *id.* at 535, the evidence is more than sufficient to support the opposite conclusion—that the FAA "offer[ed] to meet ... informally" and "attempt[ed] to negotiate a solution," FAA Handbook ¶ ¶ 7–35(f), 5–12. That is enough. *See Chritton v. NTSB*, 888 F.2d 854, 856 (D.C.Cir.1989) (citation and internal quotation marks omitted) (explaining that an agency's "conclusion may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view").