IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 10, 2008

Charles R. Fulbruge III
Clerk

No. 07-60592

LONNY J MENARD; ROXANN MENARD

Petitioners

v.

FEDERAL AVIATION ADMINISTRATION

Respondent

Petition for Review of Orders
of the Federal Aviation Administration

Before WIENER, GARZA, and DeMOSS, Circuit Judges.

DeMOSS, CIRCUIT JUDGE:

In this case, we ask whether petitioners Lonny and Roxann Menard ("the Menards") may compel respondent, the Federal Aviation Administration ("FAA") to reverse course on two administrative decisions. The Menards contend that two airspace orders made by the FAA in 2007 were arbitrary and capricious, or alternatively, that the orders were subverted by prejudice, bias, or improper ex parte communications. The Menards own a small turf runway in Berryville, Texas, as do their neighbors, who have intervened in this case on the side of the FAA, and whom we refer to collectively as "Aero Estates." The Menards contend that there is only room for one airport in their neighborhood, and that the FAA

should be compelled to clip Aero Estates' wings for good. We disagree, and put an end to one maneuver in the parties' ongoing dogfight.

I.

In the early 1980's, the Aero Estates subdivision was created in Berryville, Texas, near Lake Palestine. Central to the plan was a common runway to be shared by the homeowners. The runway is oriented east-west, and is 60 feet wide and 3,200 feet long. In 1984, the developer of the subdivision provided notice of a landing area proposal to the FAA.[1] After conducting an aeronautical study, the FAA issued a "no objection" determination. In 1996, J.W. Isaacs, a subsequent owner of Aero Estates, informed the FAA that he intended to deactivate the airport. On July 1, 1996, the FAA notified Isaacs that the airport would be removed from government charts.[2] As a result, Aero Estates was not an operational airport in the eyes of the FAA from 1996 to 2007.

Around the time the FAA removed Aero Estates from its charts, the then-owner of the Menards' property filed a notice with the FAA of intent to establish a runway. The runway is oriented east-west, and is 30 feet wide and either 1,600

---

[1] The FAA is tasked with developing plans and policy for the safe and efficient use of the nation's airspace, and "may modify or revoke an assignment when required in the public interest." 49 U.S.C. § 40103(b)(1). This authority extends to airports that do not receive federal funds—including the Menards' and Aero Estates' runways. See 14 C.F.R. § 157.1. Part 157 of the Federal Aviation Regulations requires owners of such airports to provide notice to the FAA of proposed changes affecting airspace. Id. § 157.3. The FAA then conducts an aeronautical study of the proposal, and makes one of three determinations: "no objection," "conditional," or "objectionable." Id. § 157.7(b). "A conditional determination will identify the objectionable aspects of a project or action and specify the conditions which must be met and sustained to preclude an objectionable determination;" "[a]n objectionable determination will specify the FAA's reasons for issuing such a determination." Id. While the FAA has the exclusive power to regulate airspace, it cannot regulate land use or zoning affecting the siting of airports. See id. § 157.7(a); Hoagland v. Town of Clear Lake, 415 F.3d 693, 697 (7th Cir. 2005).

[2] According to Aero Estates, this designation arose from a misunderstanding, and throughout the 1990's and to the present date, the Aero Estates airport has remained active. There is some support for this contention: an internal FAA email dated February 8, 2000 states that Aero Estates "has been a subject of controversy for at least four years. There is a question as to whether Mr. Isaacs has the unilateral authority to close this airport."

or 1,900 feet long. The runway's western end is 600 feet north of the eastern end of the Aero Estates runway; the neighboring runways are parallel but offset. After conducting an aeronautical study, the FAA indicated on July 8, 1996 that it had "no objection" to the establishment of an airport. The Menards bought the property in 1999 and, inauspiciously, named their airport Paradise Point.

In 2002, Aero Estates provided the FAA with a notice of intent to officially reactivate its airport. After conducting a study, the FAA on January 17, 2003 issued an "objectionable" determination, because the airport would "have overlapping air traffic patterns" with Paradise Point. In the following years, the FAA reviewed several other notices concerning Aero Estates and Paradise Point. First, the Menards sought to have Paradise Point's status changed from private to public use in 2003, to which the FAA issued a "no objection" determination. The Menards also sought to establish a seaplane base near Paradise Point in 2003, to which the FAA initially objected due to its proximity to Paradise Point and Aero Estates. The FAA later indicated that it did not object to a seaplane base at a different location if the seaplane base's traffic pattern did not overlap with Paradise Point's traffic pattern. However, a seaplane base was apparently never added to aeronautical charts, nor were lane markers installed on Lake Palestine to indicate a seaplane landing area.

From 2003 onward, things really turned sour. The FAA received additional complaints from Lonny Menard and another nearby property owner that aircraft were using Aero Estates' runway. Menard complained that use of the runway created "an unsafe environment" on the ground and in the air, and asked the FAA to ensure that the airspace around his airport was protected. The FAA investigated the complaints and met with interested parties, but found insufficient evidence to proceed with an enforcement action. See 14 C.F.R. §§ 13.11, 91.13(a). The Menards also contacted their Congressman, who wrote to the FAA on their behalf. In 2004, Aero Estates sought to establish a heliport; the

FAA issued a "no objection" determination, despite a complaint from the Menards that this would imperil the safety of operations at Paradise Point. In August 2006, Aero Estates again gave the FAA notice of its intent to officially reopen its airport, and the FAA again began an aeronautical study. Lonny Menard wrote to the FAA to express his objection to changing the designation of the Aero Estates runway. He urged the FAA to abide by its 2003 "objectionable" determination. The Menards simultaneously filed a state-court lawsuit seeking to enjoin the allegedly unsafe use of Aero Estates' runway. According to the parties, that suit is still pending.

While conducting the aeronautical study for Aero Estates' proposal in early 2007, the FAA was informed by the Texas Department of Transportation that Lonny Menard had requested that the Paradise Point airport not be listed by the State as open to the public. Because this contravened the FAA's 2003 designation of Paradise Point as a public airport, the FAA sent a letter to the Menards on February 14, 2007 asking whether they wished to have Paradise Point designated private. See 14 C.F.R. § 157.3(e) (requiring notice to the FAA of proposed changes in the status of an airport). Lonny Menard responded in a letter dated February 25, 2007 that he wanted the FAA "to hold publication of the airport as 'public' at this time due to the serious SAFETY CONCERNS arising from aircraft operations being conducted on an adjacent property and the refusal by the pilots of those aircraft to respect the flight patterns designated by your agency." (emphasis in original). The FAA construed this response as a request to change status under § 157.3(e), and opened a new aeronautical study. In a letter dated May 30, 2007, Lonny Menard articulated his concerns in greater detail.[3]

---

[3] The letter stated at one point: "If the holding of publication as previously requested (do not misinterpret this as a change in status, but merely as a hold due to safety concerns) has created a problem . . . then please publish the same. However, if this airport is published for public use without the prohibition of the dangerous conditions on the adjacent property, . . .

On June 7, 2007, the FAA released two "conditional" determinations; one each for the airports at Aero Estates and Paradise Point. The determinations allowed both airports to operate, provided that their respective users maintained a divided air traffic pattern. Flights at Paradise Point were to take off and approach from the north, while flights at Aero Estates were to take off and approach from the south. The orders also required the users of the respective airports to approach and leave the airspace at differing altitudes, to use the Common Traffic Advisory Frequency, and to operate only during the daytime and under visual flight rules ("VFR"). In the order for Aero Estates, the FAA stated: "It was assumed that Paradise Point Airport would continue to have a relatively short runway that would not generate enough air traffic to be a problem with operations at the Aero Estates Airport."

Displeased with these determinations, the Menards filed the current petition. They contend that the June 2007 orders are arbitrary and capricious because they disregard evidence, contravene FAA rules and regulations, and create a grave safety risk. The Menards also argue that the decision-making process was subverted by bias, prejudice, and ex parte communications.

II.

An order issued pursuant to 14 C.F.R. § 157.7 is appealable under 49 U.S.C. § 46110(a) (formerly 49 U.S.C. app. § 1486).[4] See Sandell v. FAA, 923 F.2d 661, 663 (9th Cir. 1990). Section 46110 vests this court with "exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order," or to order the Administrator to conduct further proceedings. 49 U.S.C. § 46110(c). Before we proceed to the merits of the appeal, we must ensure that we have jurisdiction. The FAA determinations at issue here are "advisory." See 14 C.F.R.

---

then the FAA is taking the position of an ostrich—burying its head in the sand."

[4] In 1994, "Congress restated the laws related to transportation in one comprehensive title." Gustafson v. City of Lake Angelus, 76 F.3d 778, 783 n.3 (6th Cir. 1996).

§ 157.7(a). Nevertheless, we have previously treated appeals of "advisory" FAA orders as reviewable and justiciable. Air Line Pilots' Ass'n Int'l v. FAA, 446 F.2d 236, 240 (5th Cir. 1971) (hereinafter "Air Line Pilots").

In Air Line Pilots, we asked whether we could review an FAA finding that three planned high-rises in Dallas, along with certain adjustments to flight procedures for Dallas's Love Field, would not create a hazard to air navigation. Id. at 237. The FAA issued its ruling pursuant to its authority to determine whether "Objects Affecting Navigable Airspace" will be hazardous to air navigation. Id. at 237-38 (citing 14 C.F.R. §§ 77.1–77.15). The FAA argued that the case was unreviewable because a determination under Part 77 has no enforceable effect. Id. at 240. Applying Abbott Laboratories v. Gardner, 387 U.S. 136 (1967), we held that the issue was ripe for judicial resolution, and that hardship would result for the parties if review were denied. Id. at 241-42. We reasoned that even if the FAA's decision had only the power of "moral suasion," such force was sufficiently "potent" to have significant practical effects on the ground and in the air. Id. at 241. Therefore, the "advisory" nature of the FAA's order did not preclude judicial review. Id. at 241-42; accord Aircraft Owners & Pilots Ass'n v. FAA, 600 F.2d 965, 966-67 & n.2 (D.C. Cir. 1979).

We see no reason to differentiate between the "advisory" order rendered pursuant to Part 77 in Air Line Pilots and the "advisory" orders rendered pursuant to Part 157 in this case. We anticipate that, owing to "moral suasion" or otherwise, the users of the airports at Paradise Point and Aero Estates will abide by the FAA's division of airspace. To do otherwise would imperil the pilots' lives. Moreover, the consequences of the FAA's determinations will be significant in other arenas. For instance, Lonny Menard informed the FAA that he was seeking an injunction against Aero Estates because "the developer and some owners at Aero Estates refuse to heed the safety determinations by FAA;" the outcome of this petition will directly impact that ongoing case. In sum, we are

convinced that the FAA's determinations may be reviewed by this court. See Sandell, 923 F.2d at 663-64 (holding that order issued pursuant to Part 157 was reviewable).

Additionally, we note for purposes of completeness that the Menards have Article III and statutory standing to challenge the FAA orders. See BFI Waste Sys. of N. Am., Inc. v. FAA, 293 F.3d 527, 531 (D.C. Cir. 2002) (hereinafter "BFI"). The Menards have alleged that they will suffer a concrete and particularized "injury in fact," to-wit, an imminent risk of collision, injury, or property damage; such harm is traceable to the FAA's June 2007 airspace orders; and the harm would be "redressable by a favorable decision" from this court. See id.; see also Massachusetts v. EPA, 549 U.S. 497, 127 S. Ct. 1438, 1453 (2007). The Menards have a "substantial interest" in both of the June 2007 orders, and therefore have statutory standing to pursue this petition. See 49 U.S.C. § 46110(a).

### III.

We now turn to the merits of the petition. We must apply the standard of review of the Administrative Procedure Act (APA), under which we review the administrative record and ask whether the FAA's orders are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see BFI, 293 F.3d at 532; Clark County v. FAA, 522 F.3d 437, 441 (D.C. Cir. 2008) (applying § 706(2)(A) because "[i]n [APA] parlance, the FAA did not conduct formal, on-the-record hearings; rather, its . . . determinations were the product of informal adjudication") (emphasis in original). While our inquiry must be thorough, the standard is "highly deferential . . . and we should not substitute our own judgment for the agency's." Gulf Restoration Network v. U.S. Dep't of Transp., 452 F.3d 362, 368 (5th Cir. 2006) (quotations omitted). Moreover, "[f]indings of fact . . ., if supported by substantial evidence, are conclusive." 49 U.S.C. § 46110(c).

The Menards argue that the FAA acted arbitrarily and capriciously in issuing the June 2007 orders because: (1) the FAA ignored their correspondence and denied them an opportunity to be heard or present evidence; (2) the FAA did not inform them that it was conducting a new aeronautical study of the Paradise Point airport; (3) the FAA misconstrued the nature of their requests when it altered the "public" status of Paradise Point; (4) the FAA did not provide a reasoned analysis for reversing its 2003 finding that it would be unsafe for Aero Estates and Paradise Point to operate in close proximity to one another; and (5) the FAA failed to consider all of the evidence available to it, including DVDs made by the Menards which allegedly show that aircraft were using the Aero Estates runway in contravention of past FAA orders.

The FAA responds that: (1) it received the Menards' correspondence, considered it, and included it in the administrative record, but was not obligated to confirm receipt of each letter or forward the letters within the agency; (2) it reasonably construed Lonny Menard's letter of February 25, 2007 as a request to change the public status of his airport, triggering a new aeronautical study under § 157.7; (3) supplemental notice of its aeronautical study of Paradise Point was not required in light of Lonny Menard's letter; (4) it was reasonable to alter its 2003 determination that pilots at Aero Estates could not fly safely because the 2007 orders specified conditions that would allow both Paradise Point and Aero Estates to operate safely; and (5) evidence of past use of Aero Estates' runway was irrelevant because the FAA has no power to enforce airspace decisions rendered pursuant to Part 157. Ultimately, the FAA argues that we must give deference to its determination that the conditions specified in the June 7, 2007 orders will "ensure the safe and efficient use of airspace by aircraft and the safety of persons and property on the ground."

A.

The Menards have not shown that the FAA's June 7, 2007 orders were arbitrary or capricious. First, the administrative record refutes the Menards' contention that they lacked an opportunity to be heard and had no notice of the FAA's aeronautical studies. The Menards' correspondence was included in the administrative record. Also, the FAA's letter of February 14, 2007 notified the Menards that airspace assignments near Paradise Point were under review. Lonny Menard's letters of February 25 and May 30, 2007, stating that he did not want the public to use his airport, demonstrate a concern that the status quo was creating safety risks. The FAA indicates that it treated the February 25 letter as a request to change the status of Paradise Point pursuant to § 157.3(e). While the request was not submitted on an official form, the FAA's Airspace Procedures Order permits the FAA to begin action upon receiving informal notice of a change from other sources. See Procedures for Handling Airspace Matters, FAA Order 7400.2F § 11-2-1(f) (Feb. 16, 2006) (hereinafter "APO").[5] After learning that the Menards wanted their airport designated non-public by the State of Texas, it was neither arbitrary nor capricious for the FAA to construe the February 25 letter as a notice of intent to change the status of Paradise Point. Lonny Menard's indication on May 30 that he did not actually wish to change the airport's status does not undermine the reasonableness of the FAA's decision to conduct an aeronautical study.

Moreover, Congress has tasked the FAA with making determinations of how to safely apportion airspace. See 49 U.S.C. § 40103(b)(1) (granting the FAA power to "modify or revoke an assignment when required in the public interest"). This necessarily looks to the future. The alleged evidence of non-compliance with past FAA directives by users of Aero Estates is therefore not determinative of what prospective division of airspace is safe and efficient. Nothing in the

---

[5] The APO has been amended effective April 10, 2008; the current version is Order 7400.2G. We will apply the APO in effect on June 7, 2007 when reviewing the FAA's actions.

Aviation Regulations compels the FAA to punish Aero Estates for alleged past violations of its directives, much less conclude that Aero Estates' pilots are scofflaws who must be grounded indefinitely.

B.

The crux of the Menards' petition is their contention that the airports at Paradise Point and Aero Estates cannot safely coexist. The Menards argue that the FAA requires a buffer zone of .25 nautical miles (1519 feet) on the side of runways opposite the traffic pattern to account for aircraft overshooting the runway on the final turn. See APO §§ 10-3-2, fig. 10-3-5 & fig. 6-3-11. The Menards argue that the FAA has acted contrary to its own safety guidelines, and therefore its orders are arbitrary and capricious. The FAA submits that, notwithstanding the buffer zone recommended by the APO, it has authority to establish non-standard traffic patterns, assign specific traffic pattern altitudes, or develop special operating procedures to mitigate potential airspace conflicts. See APO § 11-6-3.[6] The FAA contends that the June 2007 orders are consistent with this authority.

We agree. We believe that the sections of the APO cited by the Menards do not compel a finding that Aero Estates and Paradise Point are absolutely prohibited from operating simultaneously. The record amply supports the FAA's conclusion that both Aero Estates and Paradise Point can operate safely and efficiently, if the airports abide by certain traffic patterns. This was premised in part on the FAA's finding that Paradise Point's runway is short and generates so little air traffic that it would not realistically conflict with Aero Estates. As there is substantial evidence in the administrative record to support the FAA's

---

[6] "If the appropriate VFR or [Instrument Flight Rules] traffic pattern airspace area requirements overlap or if airspace requirements cannot be developed to accommodate the category and volume of aircraft anticipated at an existing or planned airport, the airport, in all cases, need not be found objectionable from an airspace utilization standpoint if adjustments to traffic patterns . . . would mitigate the conflict." § 11-6-3(a) (emphasis added).

determinations, we treat the findings as conclusive. See 49 U.S.C. § 46110(d).[7] The FAA did revise its 2003 "objectionable" determination to the proposed reactivation of Aero Estates. However, the original determination was apparently based on an assumption that Paradise Point's traffic pattern would not be altered. By contrast, in 2007, the FAA was able to craft traffic patterns for both airports simultaneously. Above all, adjusting air traffic patterns is part of the FAA's mandate. See id. § 40103(b)(1). The Menards cannot plausibly claim that the FAA lacks authority to revise its past determinations, or that past FAA orders create an entitlement to the airspace around Paradise Point. Therefore, we do not believe that the FAA acted arbitrarily or capriciously in making the air safety determinations contained in the June 2007 order.

C.

In a final point of error, the Menards argue that the FAA's decision-making process was subverted by prejudice, bias, or wrongful influence due to ex parte communications with Aero Estates. The Menards aver that Aero Estates hired Norm Scroggins, a consultant and retired FAA employee, to lobby the FAA on their behalf. Scroggins allegedly engaged in improper communications and character assassination to undermine the Menards' case. The Menards believe that this led the FAA to reach a foreordained decision. As proof, the Menards

---

[7] A memorandum from the FAA Flight Standards District Office dated June 23, 2003 reasoned that "the Paradise Point airport remains much less of a going concern [than Aero Estates], with clearly inferior aircraft operating areas and facilities. Locals interviewed stated that no aircraft have operated there in a number of years." Later, the same memorandum stated: "This office acknowledges obvious adverse safety implications in the simultaneous use of runways located in such close proximity. . . . It remains to be seen whether [Paradise Point] is actually intended to be a viable airport or merely a bargaining chip in a dispute between two competing land developers."

Similarly, when the FAA investigated Lonny Menard's complaints about Aero Estates in December 2004, Menard "did not provide a direct response" when asked how many operations a day his airport supported, and stated that he did not have an airplane at the airport. The investigators observed that the runway's grass was long, standing water was visible on the runway, and "a horse was grazing toward the other end of the runway."

11

point to a September 1, 2006 memorandum by Ben Guttery, FAA Senior Program Manager, which purportedly orders that Aero Estates be reactivated.

The FAA responds that the Menards have put forth no evidence of bias—other than a decision which runs contrary to their preferences. Moreover, when making airspace utilization decisions, the FAA may consider written correspondence, and "may consult with interested persons regarding the substance of the proposal. This coordination may be accomplished through interviews, conferences, informal airspace meetings . . . ." See Airspace Utilization Considerations in the Proposed Construction, Alteration, Activation, and Deactivation of Airports, FAA Advisory Circular 70-2E (Jan. 1, 1996). Ex parte communications are prohibited during formal rulemaking, goes the argument, but not during informal studies conducted pursuant to Part 157. See APO § 2-1-1. The FAA acknowledges that a representative of Aero Estates met with the FAA on September 29, 2006, and possibly once more in early 2007. The meetings concerned statements made by the Menards, which Aero Estates claimed were false or misleading. The FAA contends that it "did not base its determinations on any of Aero Estates' allegations" against the Menards, or the allegations by the Menards against Aero Estates.

"Actual bias is ordinarily required to invalidate decisions by federal agencies." DCP Farms v. Yeutter, 957 F.2d 1183, 1188 (5th Cir. 1992). "An administrative decision will be overturned only when the hearing officers' mind is irrevocably closed or there was an actual bias." Id. Moreover, "[a]dministrative officers are presumed objective and 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n, 509 F.3d 562, 571 (D.C. Cir. 2007) (quoting United States v. Morgan, 313 U.S. 409, 421 (1941)). While the FAA should endeavor to avoid ex parte communications, unyielding adherence to that principle during informal studies would be fatal to the quick and efficient fulfillment of the

agency's mandates. All contacts between the FAA and the interested parties (including several letters and meetings between the FAA and the Menards) were adequately documented, and the Menards have not put forth a scintilla of evidence showing that bias or improper communications clouded the judgment of the FAA. Contrary to the Menards' assertions, Ben Guttery's September 1, 2006 memorandum actually seeks the formal review of other FAA offices. It does not reveal bias or a foreordained conclusion on the part of the agency or its officers. It is therefore apparent to us that, rather than step into the cross-fire of the parties' ongoing feud, the FAA made its determinations based upon sound aeronautical studies and the agency's independent judgment.[8]

IV.

One might question whether two small airports located side-by-side can both operate safely and efficiently. The FAA determined that this is indeed possible under the conditions specified in its orders of June 7, 2007. "One does not have a right to monopolize the navigable airspace if other people can safely use it." Sandell, 923 F.2d at 665. After thoroughly reviewing the administrative record, we conclude that the FAA's determinations are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2)(A). The FAA's orders will stand as issued. See 49 U.S.C. § 46110(c).

The petition for review is DENIED.

---

[8] The FAA noted in both orders "that a letter of agreement was not possible in this case because of the intense dissension that has existed between the parties since at least 1999."